THE PEOPLE *et al. v.* KERR *et al.*

The fee of streets acquired by the city of New York under section 118 of the act of 1813 (2 R. L., 409,) is held by it in trust for the public use of all the people of the State, and not as a corporate or municipal property.

Such property being acquired by the exercise of the right of eminent domain, and the trust of the city being *publici juris*, it is under the unqualified control of the legislature, and any appropriation of it to a public use by legislative authority is not a taking of private property so as to require compensation to the city to render it constitutional.

The possibility of reverter to the owners of land abutting upon the street, after its public uses shall have ceased, is not a property constitutionally exempt from unremunerated appropriation at the will of the Government. Its value, if any, is inappreciable.

The construction of a city railroad upon the surface of the street, without change of grade, is an appropriation to public use.

APPEAL from the Supreme Court. The action was commenced to restrain the defendants (other than the Mayor, Aldermen and Commonalty of the city of New York), from entering upon Seventh Avenue, Broadway and other enumerated streets and avenues in the city of New York, and digging up and subverting the soil for the purpose of laying and operating a railroad, and to restrain and enjoin the defendants The Mayor, Aldermen and Commonalty of New York from giving their assent to such acts, or doing any other thing in aid or furtherance thereof. The plaintiffs were The People and certain

The People *v.* Kerr.

private persons who were the owners in fee of lots lying upon the streets upon which the proposed railroad was to run; and they alleged their ownership of the land in front of such lots respectively to the centre of the streets, subject only to the easement of the public—the use of the streets as public high-ways. They alleged that the corporation of the city of New York had no property or right of property in the land over which the several streets passed, except to keep them open as public streets, and that it had no power to authorize or permit any individual or corporation to incorporate therewith any private materials or property, or to authorize any obstruction therein, or any appropriation of the streets for any purpose other than their common use as public highways.

The Mayor, Aldermen and Commonalty of the city of New York demurred to the complaint, on the ground that it stated no cause of action as against them, and their demurrer was sustained, at special and at general term in the first district. The other defendants answered, and the cause was brought to trial before a judge without jury, who, having found facts sufficiently stated in the following opinion, ordered the complaint to be dismissed; and this judgment having been affirmed at general term, The People and the private plaintiffs appealed to this court.

*Daniel S. Dickinson,* Attorney-General, for The People.

*William C. Noyes* and *John Van Buren,* for the other appellants.

*Charles O'Conor* and *William M. Evarts,* for the individual respondents.

*Henry H. Anderson,* for the Corporation of New York, respondent.

EMOTT, J. The individual defendants in this case were authorized by an act of the legislature, passed April 9th, 1860, to construct and operate a railroad upon the most approved plan for the construction of city railroads, with a single or

double track, and to convey passengers thereon for compensation, through and along certain streets in the city of New York which are enumerated in the act. They are authorized to acquire any real estate which they may need for the purposes of their road, either by grant or compulsory proceedings, and they are required to make compensation for such real estate which they cannot obtain by voluntary conveyance. But the use of the streets for the purpose of the railroad is declared by the act to be a public use, consistent with the uses for which the Mayor, Aldermen and Commonalty hold such streets, and the defendants admit that they do not propose to make any compensation to any parties or persons whatever, for the use of such streets by their railway and cars.

The individual plaintiffs established by evidence at the trial, and the judge who tried the cause found as a fact, that they were the owners and occupants of lots fronting on the several streets mentioned and described in the complaint. He also found the fact that the defendants are proceeding to lay a railroad in these streets, and claim a right to operate the same with cars drawn by horses without consent from, and without making compensation to, the owners of said lots. The judge also found that laying, constructing and operating said railroad in such streets would be a material interference with, and injury to the use and enjoyment of the lots fronting thereon, to such an extent that the same would constitute a continuous private nuisance to the owners and occupants thereof, but for the act of the legislature authorizing the construction of said road. There is no finding that the plaintiffs are seised in fee or otherwise, of the streets in front of their lots. The judge decides on the other hand as matter of fact, that the city of New York is seised in fee of certain portions of such streets, by virtue of proceedings under the act of the legislature, passed April 19, 1813, in trust, nevertheless, that the same be appropriated and kept open as public streets forever, and in like manner as the other public streets in said city are or ought to be; and as to the other portions of said

streets described in the complaint, that the same had been granted and ceded to the city, pursuant to the provisions of the same act, in fee-simple, upon trust that the same be left open as public streets for the use and benefit of the inhabitants of said city forever. There is no exception to these findings, and they are conclusive upon these questions of fact in the consideration of the case. Whether the streets in question are ancient highways, or roads or streets by a more modern and comparatively recent dedication, all of them which were not opened by legal proceedings under the act of 1813, are included by this latter comprehensive finding, which establishes for all purposes of this case that the city is seised in fee of the land in all the streets in front of the respective lots of the plaintiffs in trust, to keep the same open and used as streets, in part by legal proceedings, and in part by dedication or cession.

I will stop here to consider an objection which is urged on the part of the People against the grant contained in this act of the legislature. It is said to be an appropriation of public property to private use, and therefore to be invalid, because not passed by a vote of two-thirds of the members elected to each house of the legislature, as required by sec. 9, art. 1 of the Constitution Without looking to see how far this allegation is supported in fact, it is enough to say that it must be regarded as settled in the jurisprudence of this state, that the appropriation of property to the construction or use of a railway for the transportation of persons or property, is an application of such property to the use of the public. The doctrine applies to all railways, whether traversing the state or the streets of a city; and of course the motive power used does not affect the question. So, also, the uniform course of decisions and legal proceedings since *Bloodgood* v. *Mohawk and Hudson Railroad* (18 Wend., 1), and founded upon the principles there asserted, is conclusive that it does not affect the question of public use in such cases that the property applied to it is to be appropriated by a corporation or by individuals, and not directly by the state or the people, or that the road is not of a

character to be actually used by any and every citizen with his own vehicle. Certain recent decisions which may be more particularly referred to hereafter, can readily be shown to be in nowise in conflict with this fundamental doctrine. The case of *Davis* v. *The Mayor of New York* (14 N. Y., 506), decides nothing in this respect, except the inability of the municipal authorities of New York to authorize a perpetual use of the streets by railroads. I do not understand any of the judges to assert, and certainly the court did not hold, that such a use would not be public. The case of *Williams* v. *The New York Central Railroad Company* (16 N. Y., 111), turned upon the difference in the use of land for a highway and for a railroad, assuming both to be public, or for public objects.

So far as the existing public rights in these streets are concerned, such as the right of passage and travel over them as common highways, a little reflection will show that the legislature has supreme control over them. When no private interests are involved or invaded the legislature may close a highway and relinquish altogether its use by the public, or it may regulate such use or restrict it to peculiar vehicles or to the use of particular motive power. It may change one kind of public use into another, so long as the property continues to be devoted to public use. What belongs to the public may be controlled and disposed of in any way which the public agents see fit. The numerous statutes by which railroad companies are authorized to use and occupy public highways, have not yet been questioned, and I do not see how they can be, on behalf of the People, or for any reason except when they are shown to interfere with private rights in the soil over which the highway passes. As long as the use to which a highway or any other public property or right is to be applied or transferred is a public use, it is a matter of discretion in the legislature to permit its application or transfer, and the people must question their action elsewhere than in the courts.

If the use of the streets in question in this action, for the purposes contemplated by this act is a public use, the grantees

The People v. Kerr.

of the right to apply them to this use are not to be required as a condition to such use to make compensation to the owners of any property affected by their proceedings for the con, sequential damage which may follow to the latter, however great and however inevitable it may be. Even though the construction and use of an iron track for vehicles in the streets of the city of New York, should be an interference with and injury to the use and enjoyment of the lots fronting on such streets, to such an extent that it would be a continuous private nuisance, if it were not authorized by law, yet the statute granting such authority is not unconstitutional, or invalid, because it does not require compensation for this injury to the owners of such property. Private rights and interests must and do give way in numerous instances to the demands of the public good. The books are full of cases, and the principle is perfectly well settled that for any incidental injury or any consequential interference with the use or enjoyment of private property resulting from the lawful acts of the public or its agents, no action will lie, unless there has been negligence or wilful misconduct to cause or contribute to the injury.

If, however, the acts which the defendants have done, or threaten to do, constitute a public nuisance, which was one of the points insisted upon at the trial, the case will present a different question. Any person who suffers a private and peculiar injury from the commission of a public nuisance, may maintain his own individual action for redress or prevention of the wrong. It is also true, that any unlawful interference with or obstruction of a public highway, is a public nuisance, whose commission may be punished or prevented, either at the suit of the public or of individuals who are damnified. The construction of a track through a city street in the manner described in this case, would obviously be at least a temporary obstruction of the street. If unlawful, that would be a public nuisance. So if the existence of the track in the carriage way, or its use by the peculiar vehicles adapted to it, is an obstruction of the highway, and a real interference with its ordinary use, that would be a similar nuisance, if in like

manner unlawful. If the construction and use of this railway in these streets, would involve the appropriation of private property of the city of New York, it will be an unlawful act unless done after due compensation. This is the principal, if not the only, point of view in which the rights of property of the city of New York, are material in the present controversy.

I have already indicated why the construction and use of the railway track in any of the streets of the city of New York, will not be an interference with the rights of the public. A railroad of any description is not *per se* a nuisance even in a populous town. So much, Judge SELDEN admits to be well settled in delivering the opinion of this court in *Williams* v. *The New York Central Railroad* (16 N. Y., 103.) The right of the public, that is of the people of the State, in a street or highway, is a right of passage. In the ordinary use of the highway, it is a right to pass and repass over its surface on foot or in carriages at pleasure. The right to be carried through, or over the streets in carriages of a particular description passing upon a track of a particular character, is also a public right of passage. It would obviously be so if such a track were laid down by the public authorities, and were allowed to be used by every person who chose to place a suitable vehicle upon it. If the legislature or municipal authorities, under their sanction, should construct such a track in a particular street or road, and while allowing all persons to use that track freely with vehicles adapted to it, should close the road to every other kind of travel or use, it would, nevertheless, continue to be a highway, and devoted to a public use. It is equally so, although its use is restricted to the vehicles of particular individuals, as for instance of a class of persons licensed to transport persons or property, or of a corporation having such privilege or authority, provided, these vehicles are open to the public under proper regulations, and may be used by any and every person without restriction or limitation, except compensation to the owners of the vehicle. A man may not use a turnpike without paying its tolls, any more than

The People *v.* Kerr.

he can travel in a railway train from one part of the country to another, without paying his fare. But every person who does pay the tolls of the one, or the fare of the other, may demand as a right the use of the road or the conveyance. These structures are public ways and public uses of property, and those by whom they are constructed and who receive their emoluments whether corporations or individuals are *quasi* public agents. So at least must we read the authorities by which the acquisition of lands by railway and turnpike companies against the will of the owners has been justified and sustained. The appropriation of a highway to such a purpose, or the application of a public right of passage to a limited form of use by competent authority, is neither a purpresture nor a monopoly of the street, so long as the privilege of transportation is free and common, although individuals or corporate agencies are employed or permitted, and may reap profit to themselves from the privileges conferred upon them. To hold otherwise, would be to unsettle not merely rules of law, but ultimately titles to property and individual interests throughout the State, to an incalculable amount.

We are brought to the simple question, whether, in constructing and using a railway track with city cars for passengers, through or over the streets enumerated in this complaint, the defendants will actually appropriate any property either of the city of New York or of the individual plaintiffs. If property of the latter is taken without compensation, even for a public use, the statute is in conflict with the constitution; and the remedy sought by them in this action, is obviously just and appropriate to prevent a direct invasion of their own rights.

If, on the other hand, the city have rights of property in the streets which the defendants will appropriate by constructing and using their railway, then it may well be contended that their interference with the highways is illegal, and their structures a nuisance, and that they may be restrained at the suit of the plaintiffs, on the ground that the latter will sustain special injury therefrom.

In the case of *Williams* v. *The New York Central Railroad*

(16 N. Y., 101), Judge SELDEN says, that no case is likely to arise in the city of New York, which would be entitled to much weight in the decision of the question of the right of railroad companies to make use of highways with their tracks, because he observes that it is claimed, and apparently with much justice, that as to a large portion of the streets in that city, the fee of the land, and not a mere easement is vested in the corporation. Judge HOFFMAN, in his work on the corporate powers of the city, asserts the opinion, that an absolute, entire and beneficial fee in the soil of these streets, is vested in the city, and divested from the original owners. (Hoffman's Treatise, I., 289.) It is now contended, that the application of the streets to the uses of a city railroad, will be an appropriation of this property of the city, for which the latter is entitled to compensation, and thus that the defendants threaten, under this act of the legislature, an appropriation of private property to public use without compensation. The language of the statute in 1813, is certainly explicit, that the fee of the streets to be opened under it, shall be vested in the corporation of New York. In the case of an ordinary highway, all which the state or the public obtain by their dedication or opening, is said to be an easement of a limited character. All but this remains in the original owner or his assigns, with all its incidents, subject to no restrictions or adverse rights, except this right of passage by the public. Every right of use and ownership, and every right of action for an interference with either, which is not inconsistent with the free and common use of a highway, still belongs to the original owner of the soil. If the highway is closed or the public rights relinquished, the land at once reverts in full and entire dominion.

Such is the rule which has been applied to all titles acquired by the legislative appropriation of property to public or *quasi* public uses. Such titles, although given in the broadest and most unqualified language, by statutes, are limited to what is needful to effectuate the purpose, and the original owner is deprived of nothing more. (*Hooker* v. *Utica & Minden Turnpike*

*Co.*, 12 Wend., 371; *Dunham* v. *Beach*, 36 Barb., 136; *Heyward* v. *The Mayor of N. Y.*, 3 Seld., 314.) There can be no doubt that the legislature intended to confer upon the city of New York, when its authorities accepted or enforced the appropriation of land to the purposes of a street, a more entire ownership or more complete control than was supposed to be needed, or was allowed to be acquired by the public in the case of ordinary roads. Still, in my opinion, the interest or estate thus conferred upon the city is limited and not absolute, limited by the purposes of the grant, notwithstanding the broad language of the statute. It is not needful for the purposes of this action that I should discuss the extent of the title of the Dutch government to the soil of highways existing while the city was a part of their dominion or of that of the English Crown in the roads opened while New York was a British province, nor how far the State of New York succeeded to any such rights, or has conferred them upon the city by the act of 1793. These questions, if they could be material to the main question in such a case as this, are excluded here by the findings of fact in this case.

Assuming, however, that the proceedings under the act of 1813, by which portions of these streets have been confiscated and the grants or cessions by which the residue have been dedicated, have the effect to vest in the city of New York that indefeasible and entire title in fee to the streets, yet that title is thus vested in a municipal corporation, a public body exercising, within its sphere, a portion of the sovereignty of the State. The grant is expressly upon trust, for a public purpose, that the lands may be appropriated and used forever as public streets. The title conferred upon this public agent is wholly for public purposes and not for profit or emolument of the city, if that can be regarded or treated as a private corporation, in any aspect or for any purpose. The city has neither the right nor the power to apply any such property to other than public uses, and those included within the objects of the grant. Whatever may be the quantity or the quality of the estate of the city of New York in its streets, that estate is

essentially public and not private property, and the city, in holding it, is the agent and trustee of the public and not a private owner for profit or emolument. It is not material whether the public, for whom the city is vested with this title, consists of those who may, from time to time, be citizens of New York, or includes the citizens of the State at large, although it might, I think, be shown that a trust to keep and maintain a highway is not for the benefit of the inhabitants of the adjacent city alone.

The control which the city government exercises over the soil of the streets, and its application to other uses than merely that of passage, rests upon another foundation, and can be justified by different reasons than the theory of an entire and absolute ownership by the city, like that of individual proprietors in these lands. As regards the title obtained under the street acts, it was held, in the case of *John* v. *Cherry Street* (19 Wend., 659), that it is not competent for the city to acquire land, or any title thereto, by proceedings *in invitum,* under this or similar statutes, except for strictly public uses, and, of course, in the case of land taken for a street, exculsively for that purpose. (*Embury* v. *Conner,* 3 Comst., 511.) Whatever property the city of New York holds, if any, for its own gain or emolument, and with a title of such a character as to fall within the prohibitions of our constitution against taking private property for public use, its title to the soil of the streets, itself an interest acquired by a previous assertion and exercise of the right of eminent domain, the ultimate title of the State itself, against private owners, cannot be considered such property. What has been taken from the original owners for public purposes, by the assertion of the paramount right of the sovereign power, and upon the payment of its value from public funds, and vested in a public municipal body, as a trustee, cannot be refused to the public when it is needed for a different use. Nor can compensation be demanded by this municipal body, in which the title to property thus acquired has been vested by such an exercise of the right of eminent domain. The city of New York takes and holds the fee of

the streets which have been opened under the statute referred to, in trust, that they should be kept open and used as streets, and for that only. This is a trust for the benefit of the public, not of the adjacent proprietors alone, nor of the inhabitants or citizens of New York alone, but of the whole people. The whole people have the same rights in the highway uses of such a public street as the inhabitants of the city or the owners of adjacent land. The title thus vested in the city of New York is as directly under the power and control of the legislature, for any public purposes, as any property held directly by the State, or by any public body or officer, and its application cannot be challenged by a corporation which, in respect to such property, at least, is a mere agent of the sovereign power of the people. Principles which are applicable to that part of the case which I am now discussing received careful consideration in the case of *The Hartford Bridge Company*, in the Supreme Court of the United States (10 How., 511), already referred to. The difference between a grant to a private corporation — even when that corporation may be regarded as a *quasi* public agent, holding for a public use — and a grant to a public municipality, for the promotion of strictly public purposes, is to be found most distinctly insisted upon throughout that case. And when the court of final appeal upon such questions held, as they did in that case, that such a grant to such a body was not a contract, and could at any time be revoked by the legislature of a State, without violating the constitutional inhibition against impairing the obligation of contracts, they recognized a principle which is fatal to the assertion of any absolute or private rights of property in the streets of a city, the title to which is held for public purposes by its corporate authorities.

I have discussed this question with reference to that portion of the streets in controversy here, which was taken by proceedings under the act of 1813; but the same observations apply to the lands which were acquired by such voluntary grants or conveyances as are set out or described in the findings of fact at the trial. These portions of the land in ques-

tion, the court below held as matter of fact, were ceded to the city of New York in fee upon trust, to be kept open as public streets, for the use and benefit of the inhabitants of said city forever. This is a grant upon a similar trust to that for which the lands could have been appropriated by legal proceedings. It vests the fee in the grantee for the benefit of the public, and for the uses of a street. It is true that in the finding of the judge the street is spoken of as for the use and benefit of the inhabitants of the city; but the difference in the phraseology from that used in stating the purposes of the confiscation of the other lands is immaterial. The uses of a street for which the land is granted extend to the whole public. A street in New York cannot be for the exclusive benefit of the inhabitants of the city, although it may be chiefly for their use and advantage. Even if it were regarded, however, as granted for the use and benefit of the inhabitants of the city, this would be a public use, and property acquired and applied to it would be within the power and control of the public authorities. The corporation of the city as a public municipal body holds such property by a delegation of the general sovereign power The authority for its acquisition and control is a governmental power. The interest is exclusively *publici juris*, and is, in any aspect, totally unlike property of a private corporation, which is held for its own benefit and used for its private gain or advantage. Whatever rights of domain or enjoyment the municipal body possesses by such a title, are of the nature of public and not private property, and the clause of the constitution which is now invoked has no application to such rights vested, for such purposes, in that corporation.

If, therefore, the effect of proceedings to open streets under the act of 1813, and of grants upon conditions and for purposes assimilated to them, be to vest an entire and indefeasible title in fee to the land covered by the streets in the city of New York, or if the interest which is left in the individual owner is too remote or too trifling to be regarded by the law, then there is an end of the present controversy. So far as any property or interest of the city of New York in these streets is

concerned, it may rightfully be appropriated by the action of the legislature to the uses of a city railroad, because they are public uses, and the construction and use of such a road is not an invasion of municipal rights or an illegal appropriation of any property of the municipal body in the soil of the highways.

The views which have thus far been taken may be considered a sufficient answer to the claim of the plaintiffs in this action. They certainly are so if the effect of the confiscation or dedication of the soil of the streets in the city of New York be to divest the owners of all right or title thereto.

I will, however, proceed to consider the present question in the aspect which it will assume if we concede that there is some estate or interest remaining in the owners of land taken for the streets in the city of New York, beyond or beside the title which is vested in the city.

That interest can only be the ultimate right of reverter subject to the rights of the public, or the city, to the possession and use of the land, for all the objects and purposes of a public street to which it has been devoted by confiscation or grant, and as long as it is required for these purposes. It has always been supposed and stated, that there must be a difference between the needs, and, therefore, the rights of the public, in a country road and a city street, and in the character of the servitudes imposed upon the land by the two uses respectively. In *White* v. *The City of Cincinnati* (6 Peters, 432), the court say: "Dedications must be considered in reference to the use for which they are made; and in a town or city, streets require a more enlarged right over the ground to carry into effect the purposes intended, than may be necessary for highways in the country." In *Livingston* v. *The Mayor of New York* (8 Wend., 85), and *Wyman* v. *The Same* (11 Wend., 487), the difference between the right of way, whether public or private, as a rural servitude in the case of country roads, and the urban servitude, with the rights both public and private, acquired by the dedication of lands to the purposes of a city street, is adverted to in the opinions delivered in the court of errors. The ordinary easement of a common highway, was

the easement considered in the case of *Williams* v. *The New York Central Railroad*, and in the cases cited in the opinion in that case, particularly the *Presbyterian Society of Waterloo* v. *The Auburn and Rochester Railroad* (3 Hill, 567). In this latter 'case, Ch. J. NELSON said, that " the public did not acquire any greater interest than a right of way, with the easements and privileges incident to that right, such as digging the soil and using the timber, and other materials found within the limits of the road, in a reasonable manner for the purpose of making and repairing the same. Subject to this easement, and this only, the rights and interests of the owner of the fee remained unimpaired." It will be readily seen, that the rights which are exercised by the public, in land which has been properly devoted to the purpose of a city street, are far wider. It is in evidence in this case, that the soil of the streets in the city of New York, has, for more than half a century been used for the laying of water pipes, for the supply of the inhabitants under the sanction of the city authorities, first, by the Manhattan Company, a private corporation which derived a profit therefrom, and of late years by the Croton Aqueduct Department. So gas pipes are laid under the streets through the land over which they run, and lamps are erected in the streets at the pleasure of the city. The construction of sewers is a still more marked evidence of the extent of the appropriation of the lands of individuals to the uses of the public, when dedicated as city streets. Evidence was given at the trial upon all these points; and in addition, also, that the city reserved to itself the control of the land occupied by the streets so entirely as to license excavations for private use by the adjoining owners or occupants themselves, and to forbid such interference with the soil of the street, unless with such license. Some revenue is derived by the city from these licenses or permits to excavate vaults, cellars or sewers under the streets, and this fact is appealed to as evidence that the city is the absolute owner of the land itself. It may, however, in my judgment, be referred to a different reason, as a consequence of the character and extent of the dedication implied

in the appropriation of the land to street uses, or of the trust fee as it has been called, created under the act of 1813. The right to restrain, and consequently to permit and to regulate excavations of the ground under a public street, and its application to any defined uses, results from the extent of this dedication, which is made when the land becomes a street, or where the city acquires this fee in the land in trust for the purposes of a street. I do not believe that it is necessary or possible, for the courts to lay down the exact limits of the uses to which land dedicated to a street in a great city, may be applied, or for which it may be required. Any judge who should attempt to define such limits by his own knowledge or experience at the present day, while he would no doubt go far beyond what his predecessor might have dreamed of a century ago, would, with as little doubt, be left far in the back ground in the progress of civilization and improvement, which is to take place in the hundred years to come. The principle, that in the dedication to the uses of a city street is involved the right to apply the land to all the public and beneficial uses for which such streets shall, from time to time, be adapted and applied, is one which is in accordance with the nature and character of the common law, and which will accommodate itself to the exigencies of the present and the future without injury to individuals. It is more in consonance with both principle and authority, in my judgment, to derive the control exercised by the city of New York over its streets from this source, than to attribute to the city an absolute and beneficial ownership of the land over which its streets are laid, similar to that of an individual owner. The provisions in the New York Street Acts, which have been so often adverted to, and which vest a fee instead of a mere easement in the public or the city, involve the same principle and evince the intention to give it full effect. I am not called upon at present to say whether as complete control and authority, and as entire a title to the use of lands, is or is not vested in the public authorities, whenever such lands are dedicated to the purpose of a street in other cities. In the case of *Furman street*

(17 Wend., 649.), the Supreme Court applied to the opening of streets, in what was then the village of Brooklyn, rules founded upon the doctrines laid down in the New York cases. In *Kelsey* v. *King* (32 Barb., 410), it was held in reference to a street in the city of Brooklyn, that the use of land for a public sewer was consistent with and incidental to its dedication as a street. The cases of *Plant* v. *Long Island Railroad Company* (10 Barb., 26), *Adams* v. *The Washington and Saratoga Railroad Company* (11 Barb., 449), and *Chapman* v. *The Albany and Schenectady Railroad Company* (10 Barb., 362), may also be referred to upon this point. But whatever may be the effect of a dedication of land to the uses of a street in other cities or towns, I see no reason to doubt, that the acquisition of the fee for the purposes of a street by the corporation of the city of New York, subjects whatever ultimate estate or right of reversion may remain in the original owners to a servitude commensurate with all the uses and purposes of a street in a great city; and I have no hesitation in saying, that one such use is the transportation of passengers from one portion of the city to another, through its streets in vehicles running upon iron rails imbedded in their surface. There is nothing in such a mode of locomotion inconsistent with the ordinary use of the street by common vehicles. There is nothing peculiar in the vehicle itself, except that it moves in a fixed line, and does not give way or turn out for other vehicles. I do not attach any importance to the motive power. I have no doubt that steam will ultimately be applied to carriages, upon common roads, and I suppose it might be used upon these iron ways without affecting the present question. It is said, that the presence of the rails is dangerous, if not injurious to horses and other vehicles, but so are various descriptions of pavement which are in more or less frequent use.

We cannot avoid seeing that there is a wide difference between a city railroad, which is a mere application of rails to the surface of a street pavement, and is used for the transportation of passengers from point to point along the streets, and an ordinary railroad, with its uniform unyielding grade,

its embankments and excavations, and its trains of cars pass-
ing and repassing at high speed, and used, not for the conve-
nience of the city itself, but for the transportation of persons
and property to distant places. The one is part of the com-
merce of the State or the country; the other belongs to the
convenience of the city alone. Will any one say, that there
is not a radical and complete difference between the application
of Broadway in the city of New York, for instance, to one of
the great railroads running its train of cars to distant cities or
States, and propelling them with the greatest rapidity along
a line which it may bring to a uniform level as well as to a
straight direction, and the use of the same avenue by street
cars drawn over the surface of the pavement, and transporting
passengers from street to street and from house to house, for
their accommodation? The great railways of the country are
highways, as well as city and country roads and city passen-
ger railroads. This court decided, however, in *Williams* v.
*New York Central Railroad Company*, that the use of a street
by such a railroad, was a different use from that to which it
was devoted and applied as a common highway. I am not
disposed to complain of that decision, but I think as plain a
difference can be seen between the use of a road by such
a railway as was there in question, and a railway, such as is
authorized by the statute now before us, as between the former
and a common road. This distinction between the use of a
road by a railway with its trains, and by common vehicles, is
the point upon which the case of *Williams* v. *The New York
Central Railroad Company*, was decided. That decision does
not proceed upon the fact that the defendants were a corpora-
tion, and excluded all other vehicles but their own cars from
their track, nor upon the injury or inconvenience to others
from the presence of their railroad, but simply upon the differ-
ence in the use of property for a common highway, and by
an ordinary railroad, assuming both to be public uses.

It may be said that the line of argument which I have now
indicated is but a repetition of reasoning which was finally
overruled in the case of *Williams* v. *The New York Central*

*Railroad Company*, and in certain subsequent decisions by this court. The answer is that there are two marked features of this case, two leading facts distinctly before us, which were not present or were not adverted to, either in *Williams* v. *The New York Central Railroad Company* or in any of the succeeding authorities. These are the extent of the dedication of the lands now in question to the purposes of a street and the needs of a city, as distinguished from country roads, and the differ ence in respect to the property subject to such an urban servitude between a city railroad and an ordinary railway running from one town to another. I have already cited from the case of *Williams* v. *The Central Railroad* and from the *Waterloo Church Case* (3 Hill), which is so much relied upon in that decision, sufficient to show the character of the public easement which was considered in these cases. It was argued that the land of the owner included within a highway is not dedicated to public use without restriction; which is certainly true of every dedication, whether it be of a street, a road or a public square. It was then said, in the cases referred to, that the dedication was to the purposes of a highway merely, and the public had acquired nothing beyond the mere right of passing and repassing upon the highway. In *Williams* v. *The New York Central Railroad*, and also in *Carpenter* v. *The Oswego and Syracuse Railroad Company* and *Mahon* v. *The New York Central Railroad Company* (24 N. Y., 655, 658), the fact that the railroad was not a city railroad, or of the character or design which the present defendants intend to build, but was a railroad leading from one town to another, traversing a long distance and used by trains of cars propelled at high speed and in a manner totally inconsistent, for the time, at least, with any concurrent use by ordinary vehicles, was also in the case. The recent case of *Wager* v. *The Troy Union Railroad* (25 N. Y., 526), in this court, is in no respect different from and goes no farther than those which have now been adverted to. The defendants there seem to have been a corporation which was not formed for the purpose of facilitating the transit of persons through the streets of a city, but for the operation of a railroad,

in the ordinary way, for passengers and freight, by trains of cars, and using steam or horse power. The street in question was regarded as an ordinary highway, in which the adjacent owners still had every right of ownership except for the public right of passage. The case is authority for no more than the previous decisions in this court. The rule which follows from them is that the use of an ordinary highway by an ordinary railroad is a new use, and that to convert such a highway into a railroad is to impose an additional burden upon the land. There is great force in the consideration of the difference between a common road and the railroads which the defendants in these cases had built or were building. But there is almost as much difference between the railroads and their uses, in those cases, and the road or way which the defendants in the present case are authorized to construct. These are alike only in name and in the original principle of their construction. They are intended for different purposes; they are used and operated in a different manner, and the result of their construction and use upon the ordinary uses of the highway upon which they are placed is manifestly very different.

The case of *Davis* v. *The Mayor of New York* (14 N. Y., 506), certainly decided no more than that the municipal authorities of New York have not the power irrevocably to authorize an association or a corporation to construct and operate a railroad in the streets of the city. That doctrine is not claimed, of course, to be of any direct consequence to the present question. There is something said in all the cases which have just been referred to as to the appropriation of the street by the corporation constructing the road, and the argument is occasionally used that the street is taken from the public and given to the corporation. The argument is not necessary, however, to sustain the judgments in these cases, and it is not sound in its application to this. The difference between the use of a railroad and the uses of an ordinary highway, or between the burden imposed upon the land by the one and the other, does not consist in the fact that in the one case the right of passage is exercised by all persons and all vehicles alike, and in the

other is confined to the carriages of particular persons and of a particular kind, but in the exclusive character of the railroad and the inconsistency of its use, with any ordinary travel or passage over its track.

There has been something said in the progress of the cause, and some observations may be found in the discussion of similar questions in the opinions in other cases, with respect to such a grant as that made to these defendants, creating a franchise, and interfering with the franchise of 'the city of New York. The power of the legislature to create or confer such a franchise as the exclusive right to transport persons or property by railways through these streets, and to receive tolls therefor, will not now be questioned. I have endeavored to show why I do not consider that the grant or the exercise of such a privilege involves taking or imposing a new burden upon any property, either of individuals or of the city of New York. I have also indicated the reason why I regard the use of these streets by the defendant's railway, notwithstanding the exclusive and beneficial franchise of taking tolls or passage-money conferred upon them, as an application to a public purpose. As to interfering with franchises of the city of New York, I have been unable to see how this act is obnoxious to any such complaint, or what franchise of the city is involved. But we may dismiss at once any such question. No such franchise is pleaded, nor any such interference complained of by the plaintiffs. If there is any franchise of any description belonging to the city of New York, which can be regarded as property, and which this act invades, separate and distinct from the title to the soil of the streets, it is neither the duty nor the right of the plaintiffs to complain of it themselves, or to bring the city before the courts and compel its authorities to take notice of it. If the defendants will not take any property of the plaintiffs in the construction or use of their railway, there is no other ground upon which the plaintiffs can complain of their proceedings, except that they will take property of the city unlawfully, because without compensation, and thus commit a nuisance by their appropriation of the highway. I have

The People v. Kerr.

arrived at a conclusion adverse to the plaintiffs upon both these points, and hence it is unnecessary to consider the question of parties raised by the demurrer of the city of New York. The judgment appealed from should be affirmed with costs.

WRIGHT, J. Having carefully examined the case, I shall content myself with stating, without elaboration, the conclusions reached:

1. The authority conferred on the defendants, by the act of April 9, 1860, to construct, operate and use a railroad for the conveyance of passengers for compensation, through, upon and along certain streets and avenues, in the city of New York, was not an invalid exercise of legislative power, in the absence of any constitutional inhibition or restraint. The legislature has entire control of any public rights in the highways, or streets, and what it authorizes, so that it be constitutional, cannot be complained of by the attorney-general or any one else.

2. The act referred to authorizes the defendants to construct and use a railroad track, but makes no provision for compensation to the corporation of the city of New York, or to the owners of lots fronting on the streets to be traversed by the track. Because the act does not provide for compensation either to the corporation or the adjacent land owners, but the defendants are empowered to use the streets for the transportation of passengers in carriages run on iron rails, without making compensation to any one, it is insisted, that the constitutional inhibition, which forbids the taking of private property for public use, "without just compensation" applies to the case. Conceding, however, that the laying down of iron rails, in the public streets, without any change of grade, and running carriages thereon by horse power, for the use and accommodation of city passengers, is a material enlargement and change of the nature of the peculiar public easement and a taking of the property of the owner of the soil of the street, within the meaning of the constitutional provision, it is necessary, before the validity of the act can be questioned by the attorney-general

or the other plaintiffs in the action, that the rights of the latter, or of the municipal corporation should be those of absolute owners of the fee of the land embraced within the street. Indeed, if the city corporation own the streets, in the same manner, and to the same extent as an individual does his lands, and its property in them is of such a character as to be protected by the constitutional limitation upon the right of eminent domain, the action cannot be sustained. The corporation is made a defendant, upon the allegation that it is about to consent to the construction of the railroad track by Kerr and his associates. If it owns the streets—if the absolute fee be in the corporation—and it assents to the additional burden, it removes any constitutional objection to the law. The attorney-general certainly could not be heard to maintain that that was a public nuisance, which is authorized by a constitutional act of the legislature.

3. The plaintiffs, other than the people, have no property, estate or interest, in the land forming the bed of the streets in front of their respective premises, to be protected by the constitutional limitation upon the right of eminent domain. The streets in question were voluntarily or compulsorily, and upon due compensation made therefor, transferred from the individual proprietors to the corporation in fee according to § 178 of the act of 1813, relating to the city. (2 R. L., 409 to 416.) It is found as a fact, and conceded, that under this act of 1813, all the lands in the several streets on which the plaintiffs are abutting land owners, were either taken for streets under § 178 of that act, after compulsory appraisal, or ceded by the lot owners upon an agreed valuation, pursuant to such section. Unlike our highway acts, which condemned to public use a mere easement only (2 R. L., 275), this statute provided for the "relinquishment of the lands and premises" constituting such streets, by the original proprietors, and that upon the final confirmation by the Supreme Court, of the report of the commissioners of estimate and assessment, the corporation should become and be seised in fee of said lands and premises. After such relinquishment and vesting of the fee in the city corpo-

ration, no property, estate, or interest in the land included in the streets, opened under the act, remained in the adjacent proprietors. The possibility that the public use for which the land was taken might cease, is not, I think, to be deemed as leaving in the persons from whom it was taken, a right to have the lands again in that event. (*Heyward* v. *The Mayor, &c., of New York,* 3 Seld., 314.) An interest, though technically vested, which is so limited as to be subsequent in point of enjoyment to a prior present ownership that may last forever, is not to be regarded as property, or entitled as such to immunity from destruction at the will of the government. If, however, it was conceded, that those from whom the land was taken have some remote reversionary right, in case the streets shall cease to be used as highways, the possibility of reverter is too remote and contingent to be of any appreciable value.

4. The streets in question are not owned by the corporation of New York. The corporation cannot sell or dispose of them, or even divert them to private use. Any and all titles or interest which the city has in them, is held for public use; is public property, and not private or municipal. By an exercise of State power, they were taken or confiscated to public use, and compensation made for them, not from any fund levied on the corporation, or its corporate property, or on the city or its inhabitants generally, but by an exercise of the taxing power of the State. The legislature acted under its taxing power in raising the fund or means of payment. It cannot be known that a single city corporator contributed any sum towards the purchase, and for anything that appears, the streets in question may have been wholly paid for by assessments upon non-residents. By force of the statute of 1813, the corporation became seised in fee of the land embraced within the streets, not absolutely as private or corporate property, but in trust for public use. The fee being vested in the corporation, the statutory command and authority followed to take possession, and hold the streets "*in trust,* that the same be appropriated and kept open as public streets forever, in like manner as the other public streets in said city are and of right ought to be." (2 R.

L., p. 408, § 177, 178.)  It would be strange, indeed, if these streets belonged to the city, and were beyond public control, when they were acquired by the exercise of the right of eminent domain, were confiscated to public use, when vested in the corporation, by the proceedings to open them.  I am clearly of the opinion, that the city corporation has no property in the streets of a character to be protected by the constitutional limitations upon the right of eminent domain.  It is, perhaps, unnecessary, in this case, to consider the question, whether in other streets of the city not opened under the act of 1813, the corporation has a property in them to be thus protected; but, if it were, my conclusions would be the same.  Whether the fee or ownership of the bed of the ancient streets was originally vested in the government, or the land was taken and condemned for public use, under colonial or state acts, upon paying to the proprietors a compensation for the soil or easement, or was voluntarily ceded to the public, it seems plain to me that the corporation has no property in the soil of the streets, to be constitutionally protected against the acts of the State in regulating their use.  It cannot be pretended that the absolute title and estate in the land embraced within the streets, have ever been granted to the corporation from any source.  Whatever estate or interest it holds, either conferred by the Dongan charter or by the State, is in trust for the public use.  It is not a trustee for the inhabitants of the city alone, but for the whole people.  The corporation may exercise this trust, or it may have control over the public streets, or the power of regulating their use, but that is not corporate property, nor has the corporation or any of its corporators a private interest therein, or a right to derive profit therefrom.

5.  The effect and object of the act of 1813, in relation to the streets in question, were to establish a public trust for the benefit of the whole people.  All public streets or highways are for the use of the people of the whole State, whether located in town or country.  The interest in such uses, or the ownership thereof, is *publici juris*.  It is a prevalent notion that the inhabitants of the city have some distinct and peculiar right

to the use of the streets not pertaining to the whole public, and that the corporation having paid for them, they are a semi-corporate property, and the right to govern and regulate their use a sort of corporate franchise. But this is an erroneous view. As has been seen, in regard to the streets opened under the act of 1813, compensation was made, not from the city treasury or from corporate property, but the fund for payment was raised by an exercise of the taxing power of the State. So, also, as to other streets; no compensation has been paid by the municipality, whether they were originally vested in the government, or, under colonial or State acts, opened by the exercise of the right of eminent domain. The character which the corporation has uniformly sustained has been that of trustee for the public. It was as such trustee that the State, in 1793, conveyed to it all its title, estate and interest in such street. (Greenleaf Laws.)

The interest in the use of streets being *publici juris*, the power of governing and regulating such uses is vested in the legislature, as the representative of the whole people. It is a part of the governmental or political power of the State, in no way held in subordination to the municipal corporation. If the legislature could not authorize the use of the streets in the way prescribed in the act of April, 1860, the power exists nowhere. The permission of the municipal government, the mere creation existing at the will of the State would add nothing to the power. I know of no restraint upon legislative action, unless it can be found in the constitution, and there is nothing there but the limitation on the exercise of the right of eminent domain. The city corporation, as feeholder of the streets, in trust, for public use as highways, is but an agent of the State. Any control which it exercises over them, or the power of regulating their use, is a mere police or governmental power delegated by the State, subject to its control and direction, and to be exercised in strict subordination to its will. The corporation, as such, has no franchise in connection with the use of the streets for the transportation of passengers. Whatever power or authority it possesses in respect to the carriage of

persons for hire was derived from acts of the State legis-
lature, which power may be resumed by the grantor at its
pleasure. I am aware that what is called the franchise for
carrying persons, for hire, over the streets of the city, and for
receiving a pecuniary recompense for the enjoyment of this
privilege by others, is claimed to have been enjoyed by the
corporation from time immemorial, and to have been one of,
the privileges or franchises confirmed to it by the Montgomerie
charter. But this rests in mere claim. Neither of the ancient
charters granted to the city corporation the office of carrier of
persons, or any power of licensing or receiving fees from others
for the privilege. The Montgomerie charter did, indeed, grant
to the corporation "the office of cartage, carriage and portage
of all goods, wares, and merchandise and other things to be
carted or carried in or through said city, or any part thereof."
(Montg. Charter, § 19.) But it has not been supposed that even
this was an irrevocable grant of property.

I discover no obstacle, therefore, to State legislation in
respect to the use, as well of public streets and highways in the
city as in the country. The power which the municipal cor-
poration holds and exercises in controlling and regulating the
use of streets of New York has been delegated to it by the State.
It is a grant of governmental power for local purposes, subject to
the control of the supreme power in the State. The legisla-
ture may at any time resume the power delegated. It is not
necessary that the courts should maintain or even approve of
the policy and justice of that species of legislative interference
with the local affairs of a great municipality which the act
under consideration discloses. The question is simply one of
power. I cannot doubt that the power exists with the State
legislature, without the consent or license of the municipal
corporation, to so control the use of the public streets of the
city as to authorize the construction of a railroad track therein,
on which city passengers may be transported for hire. It can
make no difference with the question that the right granted is
in the nature of a franchise, for it proceeds from the sove-

reign. The judgment of the Supreme Court should be affirmed.

DAVIES, J., did not sit in the case. All the other judges concurred, substantially upon the grounds stated by WRIGHT, J., without passing upon the distinction between the extent of the public right in city streets and country roads, and other questions discussed by EMOTT, J. ROSEKRANS, J., was of the opinion that the power of the legislature extended only to governing the mode of passing upon the surface of streets, and that, subject to this, the city of New York had all the rights of the original proprietor of the soil, and might be entitled to compensation for any privation thereof. BALCOM and MARVIN, Js., suggested that, independent of the public right in streets, whether acquired by dedication or confiscation, and of any naked fee which might remain in the original owner, with the possible ultimate right of reverter, there might be a private right in the owners adjoining the street to have free access to their premises held under the original proprietor of the tract embracing the street, of which such owner could not be deprived by the assent or surrender of the public or of the general owner of the fee of the street, or both, without compensation for his individual interest in the street or easement. This they said to preclude the conclusion, if such were possible, that any such an interest could be supposed to have been disregarded. They saw no such question in this case, and were, therefore, for affirmance.

Judgment affirmed.