THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE LEHIGH VALLEY RAILWAY COMPANY, Appellant, *v.* STATE TAX COMMISSION and Another, Respondents. (Taxes for 1916, City of Buffalo.)

Third Department, November 15, 1923.

Taxation — railroads — special franchise tax on account of crossing several streets — streets were carried over canal strip by viaducts which were constructed by city — city, by authority of Legislature, granted railroad land under viaducts — streets under viaducts were abandoned — said grant was not special franchise within meaning of term as used in Tax Law, § 2, subd. 6 (as amd. by Laws of 1916, chap. 323).

The relator is not subject to a special franchise tax on account of crossings made by it of certain public streets in the city of Buffalo, where it appears that the streets in question were carried over a strip of canal land by viaducts constructed by

**550** PEOPLE EX REL. LEHIGH VALLEY R. CO. *v.* STATE TAX COMM.

Third Department, November, 1923. [Vol. 206

the city; that thereafter the city granted to the railroad the land lying under the viaducts; that said grant was made on authority of an act of the Legislature which provided that upon the execution of the agreement between the city and the railroad company the streets should be deemed to be closed and abandoned by the city for public use, and where the only reservation made in the grant was the right of the city to make such use of the land for city purposes as would not interfere with the use of the land by the railroad.

The grant was not that of a special franchise, within the meaning of subdivision 6 of section 2 of the Tax Law (as amd. by Laws of 1916, chap. 323), but was a grant of land by the city merely in its capacity as proprietor.

Furthermore, *it seems* to be clear that the land ceased to be affected with a public use when the streets were carried over the canal strip by the viaducts which were constructed prior to the grant in question.

APPEAL by The Lehigh Valley Railway Company from a final order of the Supreme Court in certiorari proceedings to review a special franchise tax assessment, made at the Albany Special Term and entered in the office of the clerk of the county of Albany on the 27th day of September, 1922, upon the report of an official referee, confirming the relator's assessment in the city of Buffalo, N. Y., for the year 1916.

Four other appeals by the same or a successor relator, involving, respectively, the assessments for the years 1917 to 1920, inclusive, were argued with this appeal and are decided herewith, only one opinion being delivered.

*Kenefick, Cooke, Mitchell & Bass* [*Thomas R. Wheeler* of counsel], for the appellant.

*Carl Sherman, Attorney-General* [*Herbert A. Hickman* of counsel], for the respondent State Tax Commission.

*William S. Rann* [*Herbert A. Hickman* of counsel], for the respondent City of Buffalo.

H. T. KELLOGG, J.:

This is a certiorari proceeding to review the action of the State Tax Commission in making a special franchise tax assessment against the relator on account of crossings made by it of certain public streets in the city of Buffalo known as Michigan street, Chicago street and Louisiana street. The relator in this proceeding is the Lehigh Valley Railway Company. The Lehigh-Buffalo Terminal Railway Corporation, relator in four other proceedings before us, involving special franchise tax assessments made subsequently to this assessment, is a successor in interest of the Lehigh Valley Railway Company. In proceeding for tax of 1917 both the Lehigh Valley and the Terminal Railway are relators because of reorganization pending the assessment. The questions

in all five proceedings are the same. Consequently, an expression of our views in this proceeding will answer for all proceedings to explain our determinations.

In the year 1841 certain land in the city of Buffalo, now known as the Hamburg canal strip, was conveyed to the State of New York. That portion of the strip which is involved here was of a rectangular shape and stretched easterly and westerly. Reckoning from the west it was first crossed by Washington street, then by Michigan street, then by Chicago street, and then by Louisiana street, all of which extended in a northerly and southerly direction. The strip was paralleled on the south by Scott street, which was intersected by the four streets above mentioned. A narrow strip of land intervened between the Hamburg canal strip and Scott street. For many years after the Hamburg canal strip was conveyed to the State a public canal was maintained thereupon by the State. In the year 1882 the Lehigh Valley Railway Company built its line into the city of Buffalo. It acquired the strip of land lying between the Hamburg canal strip on the north, Scott street on the south, Washington street on the west, and Michigan street on the east, and upon this strip established its terminal. Its tracks came from the east, crossed Louisiana street and Chicago street, entered Scott street at Chicago street, proceeded westerly along Scott street, crossed Michigan street and entered the relator's terminal strip at the intersection of Scott street and Michigan street. The tracks were laid upon the surface of Scott street, and passed over all street crossings at the street grade. It does not appear that, prior to the year 1890, any structures had been erected to carry Michigan street, Chicago street or Louisiana street across the Hamburg canal, or the strip of land belonging to the State upon which that canal was located. Public travel upon these streets, whether from the north or from the south, therefore, for a period of nearly fifty years, must have terminated at the banks of the canal. To this extent and for the length of time indicated public use of the streets in question must have been in abeyance. Between the years 1890 and 1902 viaducts were erected to carry Michigan, Chicago and Louisiana streets over the tracks of the New York Central Railroad Company and the Erie Railroad Company lying to the north of the Hamburg canal strip and over that strip as well. The southerly ramps of the Michigan and Chicago street viaducts as erected came to the street level at the northerly boundary line of Scott street. Since at least the year 1902, therefore, the public, traveling upon Michigan street and Chicago street across the Hamburg canal strip and across the land lying between that strip and Scott street, have made no use of the

**552** People ex rel. Lehigh Valley R. Co. *v.* State Tax Comm.

Third Department, November, 1923. [Vol. 206

surface of the ground. The same is true of the public traveling in Louisiana street over the Hamburg canal strip.

The State of New York in the year 1898, having abandoned its canal, conveyed the Hamburg canal strip to the city of Buffalo. In the year 1912 the Lehigh Valley Railway Company and the city of Buffalo entered into an agreement for their mutual benefit. The city agreed to convey to the railroad the Hamburg canal strip less the land within the boundaries of Michigan, Chicago and Louisiana streets. The railroad agreed to convey to the city certain lands, to remove its tracks from Scott street and to eliminate its crossings over Michigan street, Chicago street and Louisiana street previously made at grade. It also agreed to pay the city $500,000 for the grants made to it. The railroad was also given the right to make crossings of Michigan, Chicago and Louisiana streets under the viaducts over the Hamburg canal strip and to reconstruct and elevate such viaducts so far as the same was necessary for the operation of its railroad. The grant of rights in Michigan, Chicago and Louisiana streets was made in the following language: " provided, however, that the Lehigh Company, its successors or assigns, shall have the full right, which is hereby granted, to use the land under the viaducts across said Hamburg canal strip in Michigan, Chicago and Louisiana streets for any lawful railroad transportation purposes, including the construction, operation and maintenance of railroad tracks." The contract also provided: " It is agreed that the city may use those portions of the Hamburg canal strip under the viaducts at Michigan, Chicago and Louisiana streets and beneath the surface thereof as fixed and used by the Lehigh Company, its successors or assigns, for any city use which will not interfere with the use of said lands by the Lehigh Company, or its successors or assigns, for railroad transportation purposes and the necessary clearance therefor." It also provided: " The city hereby grants and confers upon the Lehigh Company, its successors and assigns, full authority to elevate, change and modify the existing viaducts over Michigan, Chicago and Louisiana streets and their southerly approaches sufficiently to afford proper clearance for railroad purposes, and to extend, change and modify the approaches thereto, and to divert the course and direction of Michigan street and construct a new ramp approach to the southerly end of the Michigan street viaduct,— all as hereinafter more fully described and as shown upon the plans hereto attached and made a part hereof and marked Plan ' A.' " The terms of the contract were fully carried out. Both the railroad company and the city of Buffalo made the conveyances provided for by the contract. The railroad recon-

structed the viaducts, as provided for in the contract and map. It removed its tracks, as previously laid, from Scott street, Michigan street, Chicago street and Louisiana street. It laid down a new system of tracks whereby it now approaches its terminal from the east by means of the Hamburg canal strip and the lands under the viaducts over Louisiana street, Chicago street and Michigan street.

The definition of " land," " real estate " and " real property " given in subdivision 6 of section 2 of the Tax Law (as amd. by Laws of 1916, chap. 323; formerly Tax Law, § 2, subd. 3) includes " all surface, underground or elevated railroads, including the value of all franchises, rights or permission to construct, maintain or operate the same in, under, above, on or through, streets, highways or public places." The subdivision further provides as follows: " A franchise, right, authority or permission specified in this subdivision shall for the purpose of taxation be known as a ' special franchise.' " " It is essential to the character of a franchise that it should be a grant from the sovereign authority, and in this country no franchise can be held which is not derived from a law of the State." (Per TANEY, Ch. J., in *Bank of Augusta* v. *Earle*, 13 Pet. 519, 595.) " A franchise is defined to be a special privilege conferred by government on individuals or corporations, and which does not belong to citizens of the country generally by common right (2 Wash. on Real Prop. 267; *Bank of Augusta* v. *Earle*, 13 Pet. 519, 595), and it may be an incorporeal hereditament." (Per EARL, J., in *Smith* v. *Mayor*, 68 N. Y. 552.) A railroad right of way acquired from private sources, although crossed by a subsequently laid out street, does not constitute a special franchise, because the right to cross the street is not derived from public authority. (*People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Woodbury*, 203 N. Y. 167.) The relator in this instance derived its rights in Michigan, Chicago and Louisiana streets from the city of Buffalo. It is important to inquire, however, into the character and quality of the grant which the city made.

A municipality may own lands devoted to a public use, or lands not so devoted. In the latter instance it enjoys the rights of private ownership and may dispose of its lands at will. In the former it is a trustee for the use of the *public at large*. " Municipal corporations possess the *incidental or implied right to alienate* or dispose of the property, real or personal, of the corporation, of a *private nature*, unless restrained by charter or statute; they cannot, of course, dispose of property of a *public nature*, in violation of the trusts upon which it is held, and they cannot, except under valid legislative authority, dispose of the public squares, streets, or commons." (Dillon Mun. Corp. [5th ed.] § 991.) " The fee of streets

554 PEOPLE EX REL. LEHIGH VALLEY R. CO. *v.* STATE TAX COMM.

Third Department, November, 1923. [Vol. 206]

acquired by the city of New York under section 118 of the Act of 1813 (2 R. L. 409)* is held by it in trust for the public use of all the people of the State, and not as a corporate or municipal property." (*People* v. *Kerr*, 27 N. Y. 188, headnote.) " The Legislature of the State represents the public at large, and has, in the absence of special constitutional restraint, and subject (according to the tendency of more recent judicial opinion) to certain private and property rights and easements of the abutting owner, full and paramount authority over all public ways and public places." (Dillon Mun. Corp. [5th ed.] § 1122.) In *People* v. *Kerr* (*supra*) it was said: " When no private interests are involved or invaded the Legislature may close a highway and relinquish altogether its use by the public, or it may regulate such use or restrict it to peculiar vehicles or to the use of particular motive power." In *Kings County Fire Ins. Co.* v. *Stevens* (101 N. Y. 416) it was said: " That the last proposition is correct seems to be clearly intimated in *Brooklyn Park Comrs.* v. *Armstrong* (45 N. Y. 234, 243) where it is said that, if the city took the fee of land free from a trust, it could convey when and as it chose, but could only be permitted so to do when a trust existed, by the sanction of the Legislature. Except when restrained by their charters or the statute, all corporations have the absolute *jus disponendi* (2 Kent's Comm. 281); and where no trust is imposed upon the property which a municipal corporation holds in fee, it has an inherent right to sell and convey, and needs no legislative aid." In *Craig* v. *Rochester City & Brighton R. R. Co* (39 N. Y. 404) it was remarked that the operating of a surface railroad in a public street was not merely an additional burden upon the fee; it was an interference with public travel. The court said: " Instead of being the exercise of a right of passage and repassage over a highway or a street, it cannot, I think, be denied, that it is sometimes an obstruction to travel, and an infringement upon the rights of the public, and owners of land." In *People* v. *Kerr* (*supra*) it was held that where the fee in a street is owned by a municipality the Legislature may authorize a street railroad company to lay its tracks and operate its cars in the street. In *Peck* v. *Schenectady R. Co.* (170 N. Y. 298) it was held that where the fee in a street is owned by an abutting owner, the Legislature has no such power. The acquisition by a railroad of power so to lay its tracks and operate its trains, involves, then, a grant of two distinct rights. One is the property right to burden the landowner's fee with an additional servitude. Power to grant this right, whether the landowner be a municipality or an abutter, is an attribute of land

* *Sic.* See R. L. of 1813, chap. 86, § 178; 2 R. L. 409, 414, § 178.— [REP.

proprietorship, and is wholly unrelated to sovereign or governmental power. Even where the Legislature, in the case of a street the fee in which belongs to a municipality, grants this right, it merely acts in lieu of the municipality to make a conveyance of an interest in land. The other right is the right to diminish, obstruct or affect the uses of the street by the public at large. The sovereign or governmental power of the Legislature, which is the representative of the public at large, the *cestui que trust*, so to speak, for whose benefit the street exists, is required to be exercised to convey this right. By its conveyance the grantee railroad becomes one of the class of beneficiaries for whom the street is held, and the rights of other beneficiaries are correspondingly minimized. The State alone, by its Legislature or a delegate of the Legislature, may grant this right. It is by the grant of this right alone, and not otherwise, that a *franchise* is conveyed, for, as we have seen, it is of the essence of a franchise that " it should be a grant from the sovereign authority " and a " special privilege conferred by government." The statutory definition contained in subdivision 6 of section 2 of the Tax Law (as amd. *supra*) itself indicates that a " special franchise " exists only where the user of lands by the public at large is affected, since such a franchise is limited thereby to rights over land devoted to the public use, viz., " streets, highways or *public* places." The sovereign power to grant franchises may be delegated by the Legislature to a municipality. " The Legislature, instead of exercising directly this authority as to the uses of streets and public places, may authorize it to be exercised by local or municipal authorities." (Dillon Mun. Corp. [5th ed.] § 1129.) In order to have a special franchise, however, the municipal authority must exercise not merely its proprietary rights as a landowner, but its delegated sovereign power as well. The question in the case, therefore, is whether the city of Buffalo, in making a grant to the relator of rights to cross Michigan, Chicago and Louisiana streets under the viaducts built thereover, acted merely in its capacity as the proprietor of a title in land, or exercised as well a sovereign power, if that power had been committed to it, and dispensed a governmental license or franchise to restrict, modify or affect the use of these streets by the public at large.

Legislative authority to contract with the Lehigh Valley Railway Company for the public improvement in question was granted to the city of Buffalo. (Laws of 1911, chap. 864.) The contract finally agreed upon, together with the plan of improvement attached thereto which was made the basis of the alterations in Michigan, Chicago and Louisiana streets afterwards effected, constituted an acceptance, with slight modification, of an offer made

by the Lehigh Valley Railway Company on the 24th day of February, 1910. This offer is specifically referred to by the act in question, and the offer and plan presented upon that date are expressly approved with such modifications thereof as might seem proper. The act then ordains as follows: "Such plans and contracts may also provide for the closing, discontinuance, contraction, alteration or change in the course or grade of any street, alley or public ground, or part thereof, and for the abandonment by the city for public use of any lands in the district hereinbefore described. Upon the adoption of such plan or plans and the execution of any such contract, such street or alley or public ground, or part thereof, shall be and shall be deemed closed, discontinued, contracted, altered or changed, and such other lands shall be and shall be deemed abandoned by said city for public use in conformity with such plan or plans and contract or contracts; and the said common council may grant and convey by deed, to be executed by the mayor of said city, to any such railroad company or companies or other parties to said agreement the city's interest in and to any such street, alley or public ground, or parts thereof, so closed, discontinued, contracted, altered or changed, and in and to any real property of the city in said district." It will be seen from the foregoing that the city was authorized, by the adoption of the plans referred to, to contract "for the abandonment by the city for public use of any lands in the district hereinbefore described." Furthermore, it was provided that upon the adoption of the plans and the execution of such contract the streets involved should be deemed "closed, discontinued, contracted, altered or changed," and all other lands should be "deemed abandoned by said city for public use in conformity with such plan or plans and contract or contracts." The act does not, therefore, express a grant of power to the city to confer upon the Lehigh Valley Railway Company a franchise to build its tracks and operate its trains upon Michigan, Chicago and Louisiana streets in common with the public at large, or in diminishment of its rights. It rather provides that public user of such portions of these streets as lie under the viaducts shall cease and to that extent that the streets shall be abandoned. There certainly can be no special franchise to use lands when the public at large have ceased to have any interest in such lands.

The city granted to the Lehigh Valley Railway Company "The full right, which is hereby granted, to use the land under the viaducts across the said Hamburg Canal strip in Michigan, Chicago and Louisiana streets for any lawful railroad transportation purposes, including the construction, operation and maintenance of

railroad tracks." It reserved to itself the right to use only such portions of those streets as might be necessary " for any city use which will not interfere with the use of said lands by the Lehigh Company, or its successors or assigns, for railroad transportation purposes and the necessary clearance therefor." The rights granted were " full " and they were paramount. The only uses reserved by the city were subordinate uses, and, in case exclusive use was required for railroad purposes, no use of the land in question could be had by the city. It will be remembered that since, at least, the year 1902 viaducts had existed for the purpose of carrying the traveling public upon Michigan, Chicago and Louisiana streets over the Hamburg canal strip, and that for this period, at least, no public user had been made of the lands underneath the viaducts, rights in which have been granted to the Lehigh Valley Railway Company. It would seem to be clear that the lands had ceased to be affected with a public use since that year, and that the subsequent placing of tracks upon the lands and the operation of trains thereover by the Lehigh Company in nowise affected a public user to interfere with which the grant of a special franchise was necessary. However this may be, it certainly appears that the lands under the viaducts ceased to be subject to street uses when the contract between the parties was signed and the grants between them were made. We think, therefore, that the city of Buffalo made a grant of rights of way in the lands under Michigan, Chicago and Louisiana streets to the Lehigh Valley Railway Company; that in making these grants it exercised merely its proprietary rights; that it exercised no sovereign power to grant franchises; that the relator laid its tracks and operates its trains not as a licensee or as the beneficiary of a public franchise, but as the owner of an interest in land.

Authority for the views expressed will be found in *People ex rel. Hudson & Manhattan R. R. Co.* v. *Tax Comrs.* (203 N. Y. 119). In that case the Commissioners of the Land Office of the State of New York had granted to the relator a right of way in a strip of land under the Hudson river 160 feet wide and 40 feet high for the construction of tunnels and the operation of trains therein. The waters of the Hudson river were navigable, and constituted a public highway. Nevertheless it was held that the relator was not the recipient of a special franchise, but was the owner of a title to land, and that the rights enjoyed by it were not subject to taxes as special franchises. Chief Judge CULLEN said: " The action of the Land Commissioners was not a grant to the company of any franchise. It was simply a grant of a title to land. Whether the letters patent conveyed a fee or an easement is immaterial. The com-

pany acquired by it such an interest in the land as authorized it to construct thereon its tunnels and railroad, not under any special franchise, but by virtue of its ownership of either land or an easement therein." He also said: "The right here granted was the private right or title to the soil, which in no way conflicted with or affected the rights of the public in the river. It is some privilege that has been given a party either in derogation of the public right, or as sharing in or by virtue of the public right that is a special franchise, not where all that has been done is done by virtue of the ownership of the soil or some interest therein." Further authority for these views will also be found in *People ex rel. N. Y. C. & H. R. R. R. Co.* v. *Woodbury* (167 App. Div. 428).

For the reasons expressed the order should be reversed and the assessment canceled.

VAN KIRK, HINMAN, HASBROUCK and McCANN, JJ., concur.

Final orders reversed on the law and final orders canceling the assessments directed, with costs.