Andrews, J.
— These are motions to continue in junctions restraining the defendant from constructing a surface railroad in Thirty-fourth street, in the city of New York, during the pendency of the actions.
The defendant is a corporation organized under chapter 252 of the Laws of 1884, for the purpose of constructing and operating a street surface railroad, the route of which, as stated in its certificate of incorporation, is to he from the foot of Forty-second street, at the Hudson river, through Forty-second street to the Tenth avenue; thence through Tenth avenue to Thirty-fourth street; thence through Thirty-fourth street to the East river; and also through Thirty-fourth street from Tenth avenue to the North river.
A resolution giving the consent of the common council to the construction of such a road upon said route was passed December 20, 1884, and having been returned by the mayor without his approval or objections thereto, became adopted on December 27, 1884, as provided by section 75 of chapter 410 of the Laws of 1882. Soon afterwards the defendant commenced work and was proceeding to construct a railroad upon that portion of said route lying between Sixth and Fifth and Fifth and Madison avenues, when these actions were commenced and the further prosecution of the work restrained by injunctions granted therein.
The plaintiffs are the owners of property fronting on *455 Thirty-fourth street, between Sixth and Lexington avenues, and claim that their property will be greatly injured by the construction and operation of the defendant’s proposed road, and, if such claim be well founded, can undoubtedly maintain these actions, if such construction and operation are not authorized by law. The construction and operation of street railroads in this state are provided for and regulated by section 18 of article 3 of the Constitution, and chapter 252 of the Laws of 1884. The portion of said section 18 applicable to the matter is as follows: 66 So law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of that portion of a street or highway upon which it is proposed to construct or operate such railroad be first obtained, or in case the consent of such property owners cannot be obtained, the general term of the supreme court, in the district in which it is proposed to be constructed, may, upon application, appoint three commissioners who shall determine, after a hearing of all parties interested, whether such railroad ought to be constructed or operated, and their determination, confirmed by the court, may be taken in lieu of the consent of the property owners.”
This provision of the constitution is incorporated in said chapter 252 of the Laws of 1884, in which it is also provided that “ for the purposes of this act the value of the property so bounded shall be ascertained and determined from the assessment-roll of the city or town in which such property is situated, confirmed or completed last before the local authorities shall have given their consent.”
The defendant having become incorporated under said act, and having obtained the consent of the local authorities to the construction and operation of its proposed road, claims to have also obtained the requisite consents of property owners, while the plaintiffs insist that all the consents so obtained do not *456 represent the one-half in value of the property, the consent of whose owners is made necessary by the constitution and statute aforesaid. Whether or not consents to the necessary amount have been obtained by the defendant cannot be determined by a mere arithmetical calculation, but depends upon the decision of several questions of law and fact, some of which are of considerable difficulty. The first question to be dealt with is whether it is necessary for the defendant to have the consents of the owners of one-half in value of the property bounded. on each street or portion of street upon which it is proposed to construct the railroad, or whether the requirements of the constitution and the statute will be satisfied if the defendant has the consent of the owners of one-half in value of the property bounded upon the whole of the route over which it proposes to build its road.
The learned counsel for the defendant contends that the latter view is the correct one, but after a careful consideration of his argument I am not able to concur with him on this point. The constitution and the statute require the defendant to obtain “ the consent, in writing, of the owners of one half in value of the property bounded on * * * that portion of a street or highway upon which it is proposed to construct or operate such railroad.” The language here used is so clear and explicit as to make it difficult to argue about the matter at all. I do not see how there can be any well founded doubt as to the sense in which the words “ street ” and “ highway ” are used. Streets and highways are both roads, and for certain purposes every public street is a highway. As a rule, however, in law and in common understanding, based upon long continued usage, a “ street ” and a “ highway ” mean two different things. “ Strictly, a street is a paved way or road, but the term is used for any way or road in a city or village ” (Brace agt. N. Y. Central R. R. Co., 27 N. Y., 271). I have no doubt that the words “ street ” and “ highway ” have the same meaning respectively in the constitution that the former has in almost innumerable laws *457 relating to cities and incorporated villages, and that the latter has in the body of laws of this state known as the “ highway acts.” Hor is there any ambiguity in the phrase “ that portion of a street or highway.”
It is stated by counsel that when this amendment of the constitution was originally submitted to the commission, it contained the words “ each street,” and that the words “ a street ” were substituted therefor, and he infers that such change has some significance. It seems to me, however, that “ a street ” means the same as “ any street,” and that the phrase “ that portion of a street or highway ” has the same meaning and effect as the phrase “ that portion of each street or highway ” would have had if the latter had been employed.
I think that the plain and unequivocal meaning of the constitution and the act of 1884 is, that when it is proposed to construct a surface railroad along the whole length of a street, or along the whole length of several streets, it is necessary to first obtain the consent in writing of the owners of one-half in value of the property bounded upon the whole length of such street, or upon each of said streets, as the case may be; and when it is proposed to construct a surface railroad upon a portion of a street, or upon portions of several streets, it is necessary to first obtain the consent in writing of the owners of one-half in value of the property bounded upon such portion of the one street, or upon such portions of each street as is, or are, to be built upon. Confirmation of this view of the meaning of the constitution and the statute, if confirmation were needed, could be found by a consideration of one of the evils which undoubtedly led to the adoption of the constitutional amendment in question, and which it was intended to remedy. It was formerly claimed that the common council of the city of New York possessed the power to authorize the construction of surface railroads upon the streets of that city, and in the year 1850, and the several yearn immediately subsequent thereto, ordinances were adopted authorizing private individuals to construct a number of such roads, and, *458 among others, one whose route was partly through Broadway. A protracted litigation followed, and it was finally decided by the court of appeals that the common council did not possess this power (Milhau agt. Sharp, 27 N. Y., 612). Pending this litigation the legislature passed an act (chapter 140, Laws of 1854) forbidding the common councils of cities to permit railroads to be constructed within their limits without the consent of a majority in interest of the owners of property upon the streets in which the railroads were to be constructed, but also confirming grants already made.
In 1860 another law was passed (chap. 10), which provided that no railroad should be constructed upon any of the streets of the city of New York except under the authority of the legislature, to be thereafter granted; and at the same session a number of acts were passed authorizing the construction of railroads in said city (Laws of 1860, chaps. 511, 512, 513, 514 and 515).
Further litigation followed, the city as well as property owners contesting the right of the legislature to pass these laws; but the validity of such acts was finally established by the court of last resort (People agt. Kerr, 27 N. Y., 188). This decision was rendered in 1863, and from that time until the adoption of the constitutional amendment, which took effect on January 1,1875, the legislature continued to exercise exclusive control over the construction of railroads in said city. There can be no reasonable doubt that the oft repeated remonstrances of owners of property in the city of New York, who felt aggrieved by the injury done, or which it was feared would be done, to their property by the construction of some of these roads, was largely instrumental in securing the adoption of such amendment of the constitution, which was introduced by an ex-mayor of that city (Journal of Constitutional Commission, pp. 80 and 87).
Now, an examination of the resolutions of the common council, and of the acts of the legislature authorizing the construction of railroads in the city of New York, and of the *459 cases in which the numerous and bitter legal contests in regard to such construction are reported, shows that while property owners had a general ground of complaint, because of the number and character of the roads so authorized, they had also a special and particular grievance, which was this : The building of a road might be authorized which was to run through portions of many different streets, and the owners of property on most of such streets might desire to have the road built. The owners of property on one street might, however, consider that the construction of the road through that street would be ruinous to their property, and it might be entirely practicable to construct the road through the other streets without going through that one street. Still, no matter how injurious to their property or how unnecessary that the road should pass through that particular street, the owners of property upon it were absolutely without remedy if the promoters of the project saw fit to insist that such street should be included in the route. It may well be that it was this special, and in some cases almost unendurable grievance, which led to the .adoption of the constitutional amendment in its present form, and that it was framed, as it is, with the express purpose and design that the owners of property upon every street through which it is proposed to construct a railroad, shall, at least, have a right to be heard before the railroad is built. In other words, if it were proposed to construct a railroad in Fifth avenue or Broadway, in the city of New York, that the owners of property on each of those streets should have the right to determine, in the first instance, whether the road should be built, and not the owners of property on Twelfth avenue or avenue C or some other remote street which might be included in the “ route ” of the proposed road.
The objection that, if this view be correct, the owners of property on a single street, or even a single block, might prevent the construction of a railroad necessary for the convenience of the general public, has no force. The constitution *460 and the act of 1884 both provide that if the requisite consents of owners of property cannot be obtained the general term of the supreme court shall appoint three commissioners, who shall, after hearing all parties, decide whether the road shall be built, and their determination, when confirmed by the court, is final. Thirty-fourth street, Tenth avenue and Forty-second street, the route of the defendant’s proposed road, are separate streets, laid out' as such upon the map of the city filed by the commissioners appointed under chapter 115 of the Laws of 1807, and, in my opinion, before such road can be lawfully constructed the consent of the owners of one-half in value of the property bounded upon that portion of each of those streets upon which it is proposed to build the road, must first be obtained; or the building of the road must be authorized by commissioners appointed by the general term of the supreme court and by the general term itself.
The next question to be considered is how the value of the property is to be ascertained. The constitution requires the “ consent of the owners of one-half in value,” which I suppose must mean the actual value. The statute, doubtless with the view of avoiding the great difficulties that would arise in attempting to obtain a valuation of each piece of property, provides that the value shall be ascertained and determined from the assessment-roll of the city or town in which the property is situated, confirmed or completed last before the local authorities shall have given their consent.
If property upon a street is assessed fairly and uniformly it will, of course, make no difference in the result whether the consents obtained are of the owners of one-half in actual value or one-half in assessed value. TSTo point is raised in this case as to any irregularity of assessment, and it is not necessary for me to consider whether the provisions of the constitution and statute are in conflict. A question is raised, however, with reference to property which is exempt from taxation.
Formerly property exempt from taxation was not valued upon the books provided for in chapter 302 of the Laws of *461 1859, called “the annual record of the assessed valuation of real and personal estate,” of which the assessment-rolls are copies. The practice was changed in this respect a few years since, owing to a difficulty which arose in regard to assessments for local improvements. Section 7 of chapter 526 of the Laws of 1840 provided, in substance, that no assessment for any local improvement should be imposed upon real property to an amount more than one-half the value of such property, as valued by the ward assessors (now deputy tax commissioners). Churches and other property exempt from taxation, and therefore not valued on the tax books, were liable to be and were assessed for local improvements. Many such assessments were vacated by the courts, because, as there was no valuation at all, it was impossible to say that the assessment did not exceed the limits of one-half the value as prescribed by said act of 1840.
To remedy this difficulty the practice was instituted, and now continues, of valuing all property exempt from taxation, and such values appear upon the tax books. It was objected that the tax officers had no power to value property except for the purpose of taxation, but such objections have been overruled by the courts, and it has been decided that such valúa-, tions furnish the criterion "for determining whether an assessment for a local improvement exceeds one-half the value fixed as required by said act of 1840 (Matter of St. Mark's Church, 11 Hun, 381; 74 N. Y., 610). Mow it is" clear that the method pursued in making up the gross valuations of property upon a street must be the same as that followed in calculating the amounts of the consents of the owners. That is to say, it will not do to take the assessed value of a particular piece of property in calculating the gross valuations, and then value the same property half as much again in determining the amount of the consents; the methods pursued must be consistent, and either the assessed or the estimated value must be used on both sides of the account. In the present case, this course has been followed with reference to property *462 liable to taxation. The valuations have been taken from the tax books and the same valuations have been used in making up the gross amount of property and the consents of owners. This makes it necessary that the same method should be pursued with reference to property exempt from taxation. It will not do to take assessed valuations of taxable property and estimated valuations of exempt property. The valuations of the exempt property must be taken from the tax books and those valuations must be used both in making up the gross amounts of property and in reckoning up the consents of owners. If the views hereinbefore expressed are correct the defendant has not obtained consents sufficient to authorize it to construct a railroad in Thirty-fourth street. As a railroad in a public street, constructed without authority of law, would be a public nuisance, the burden of proof is upon the defendant to show that it has such authority.
A great number of consents were produced in court, and I have been furnished with statements and tabulations, sworn and unsworn, purporting to show the gross valuations of all the property bounded on Thirty-fourth street, and the amount in value of the consents given by owners of property on that street to the construction of the proposed road. The statements submitted on behalf of the defendant have been prepared on different bases, but, as I understand it, one basis is to take the values of taxable and exempt property from the tax books both in making up the gross valuations and the amount of the consents of owners, which basis, as above stated, I regard as the correct one. According to one of these statements the excess of consents over one-half the value of the property is $295,800, while according to a later statement such excess is $93,800.
Upon its own figures, therefore, the defendant fails to show the requisite amount of consents; for, to reach the above results, it. includes the property of the New York Institution for the Blind, valued at $650,000, and many pieces of property valued at sums aggregating a large amount, the lessees only of which have signed consents, neither of which, upon the *463 papers before me, can possibly be included in making up the amount of such consents.
A paper was produced in court, signed “ D. L. Suydam, V. P.,” purporting to be a consent on behalf of such institution for the blind; but since the hearing I have been furnished with what purports to be, and, as I understand, is conceded by the defendants’ counsel to be, a copy of a resolution adopted on February 4, 1885, at a meeting of the board governing such institution, in which it is stated that the signature of Hr. Suydam, as vice-president, to the application of the defendant for permission to lay its tracks in Thirty-fourth street was unauthorized by the board. With this resolution before me, and with no evidence whatever as to what authority Hi1. Suydam had in the premises, except that he was vice-president, and that the president was absent, and the burden of proof being on the defendant, it is impossible for me to treat the paper produced as the consent of the institution in question. FTor can the consents given by lessees be received. The constitution and the statute require the consents of the owners of the property; and while, for some purposes, a lessee may have been held to represent the owner, or to have power to bind the owner, it does not seem to me that such decisions can have any application to the present case. An interpretation of the constitution, which would confer upon a lessee for a year, or a month, the power to give a valid consent to the construction of a railroad in front of the property leased, when the owner might consider that the railroad would seriously injure his property, is wholly inadmissible. Deducting the value of the property of the institution for the blind, and the consents given by lessees, and the amount of the consents of owners of property bounded on Thirty-fourth street falls far short of the requisite one-half in value. Quite a number of the consents of the owners of property bounded on Thirty-fourth street, between Lexington avenue and the Fast river, and Sixth avenue and the Tenth avenue, are given on condition that the defendant shall not lay new tracks in *464 front of such property, or that the cars of the defendant shall be run only upon the existing tracks of the companies which are now operating railroads in those portions of Thirty-fourth street. The plaintiffs claim that these consents are worthless, on the ground that the constitution and statute do not provide for conditional consents, and that the right of the property owners is only to consent absolutely and unconditionally to the construction of a railroad in Thirty-fourth street, or not to consent at all. The plaintiff also claims that, at any rate, such consents to operate a railroad in certain parts of that street cannot be regarded as consents to construct a railroad in another part of the same street.
The plaintiffs also claim that the defendants cannot lay new tracks in Thirty-fourth street, between Lexington avenue and the East river, nor between the Sixth and Tenth avenues, without the consent of such other companies, and this claim is sustained by the recent decision of Mr. justice Ingeaham in the case of the Forty-second Street and Grand Street Eailroad Company against this defendant. Such consent has not been obtained, nor has the defendant secured in any way the right to run its cars over the tracks of the old companies. The plaintiff insists that, under these circumstances, the sole purpose of the defendant, at present, is to construct a railroad in Thirty-fourth street, between Lexington and Sixth avenues, and that it cannot lawfully do this until it has obtained the right to construct or operate a railroad over the rest of its proposed route.
The questions raised by the plaintiff as to the validity and effect of conditional and partial consents, and as to the right of the defendant to construct a road upon a part of Thirty-fourth street without first obtaining from the old companies the right to construct or operate its road over the other portions of that street, are serious ones ; but as, without regard to these questions, the defendant has not obtained the requisite' amount of consents, it is not necessary to pass upon them now.
The motions to continue the injunctions during the pendency of the litigations must be granted.