DETERMINED IN THE

# FOURTH DEPARTMENT

IN THE

## APPELLATE DIVISION,

### March, 1900.

---

WILMOT CASTLE, Appellant, *v.* THE BELL TELEPHONE COMPANY OF
BUFFALO and Others, Respondents.

*Right to put a conduit for telephone wires in a street, without making compensation to the abutting owners of the fee thereof — rural and urban highways distinguished.*

The placing, pursuant to a resolution of the common council of a city, beneath the surface of a street, the fee of which is in the abutting owners, of a conduit for telephone wires owned by a private corporation, which have previously been maintained on poles erected in the street, does not constitute an additional burden upon the street which will entitle the abutting owners to additional compensation.

LAUGHLIN, J., dissented.

The distinction between rural and urban streets considered with reference to the uses to which they may be put.

APPEAL by the plaintiff, Wilmot Castle, from an order of the Supreme Court, made at the Monroe Special Term and entered in the office of the clerk of the county of Monroe on the 23d day of December, 1899, vacating an injunction, except that part thereof which requires defendants' attorneys to give the plaintiff's attorneys a stipulation that said defendants will not demand from plaintiff any compensation for any damages which defendants may have sustained by reason of said injunction.

The plaintiff is the owner of a lot situate upon the west side of Oxford street in the city of Rochester, the fee of which extends to the center of that street.

The Bell Telephone Company of Buffalo for upwards of twenty years last past has owned and operated a telephone system in the same city, and in the conduct of its business has, until quite recently, maintained and used poles with wires strung thereon in the streets of the city. Its system, as thus located, was operated without objection from any source until 1888, when the common council adopted a resolution which in express terms granted to the company the right to erect and maintain its poles and appliances in the city streets, but the privilege thus conferred was subject to certain conditions, one of which was that the company should " at its own cost, place, and thereafter at all times maintain, its wires and cables and conduits underground in the principal public streets, avenues and places of said city, as rapidly as possible, and to that end shall substitute in place of the present system at least one-half mile of underground conduits with all its cables and wires therein, in the present year 1888, and not less than one-half mile in each year thereafter, until at least three miles of conduits are completed and all its wires placed therein in the localities, and in the manner designated by, and also under the supervision of, the executive board or common council of said city." And should also grant " to the said city the right to the use of all poles now or hereafter erected by said company   *   *   *·  and of any conduit hereafter laid by it as aforesaid, for the purpose of maintaining all wires and cables belonging to or used by said city, at any time, in any of its departments or services thereof,   *   *   * including those of the fire alarm telegraph and police patrol systems."

All the conditions thus imposed were duly accepted and their enforcement was provided for by a contract which was subsequently executed by both the company and the city.

Oxford street is one of the public streets of the city of Rochester, upon which the telephone company had erected its poles and appliances; and through the center of this street there is a grass plat about twenty feet in width, with a roadway upon either side. In pursuance of the requirements of the contract just referred to, the company in November, 1899, employed the defendants Whitmore, Rauber and Vicinus to remove its Oxford street wires from the poles to which they were then attached, and place them in an underground conduit, and to this end a ditch some two and one-half feet in depth and fifteen or twenty inches in width was excavated through

the center of the grass plat above mentioned, the intention being to fill up the ditch when the wires were properly secured therein, and replace the sod upon the top thereof so as to interfere as little as possible with the surface of the street.

This work was undertaken by permission of the executive board of the city, but, before it was consummated, the plaintiff brought this action, the main object of which is to restrain the defendants from further operations.

*Joseph W. Taylor,* for the appellant.

*John A. Barhite,* for the respondents.

ADAMS, P. J.:

Several propositions are advanced and discussed with some degree of earnestness by the respective counsel in their briefs, but as they are all subsidiary to and dependent upon the right of a telephone company to place its appliances in or upon a public street of a populous and thriving city without making compensation to the owner of the fee, we shall direct our attention solely to the consideration of that feature of the case.

So much has been written respecting the rights and burdens incident to the ownership of land which has been taken for or dedicated to highway purposes, that a further discussion of the subject would seem almost like a work of supererogation, and yet it will be difficult, if not impossible, to properly consider the important question which this case presents without referring somewhat to principles which have long since passed beyond the realm of controversy.

And at the outset it may relevant to suggest that a public highway, while primarily intended for the accommodation of travelers employing the ordinary means of locomotion, such as vehicles drawn by animals, is, nevertheless, in another and broader sense, a public convenience. It is appropriated for that purpose, and when thus taken or dedicated nothing remains in the original proprietor but the naked fee, for, as has been well said, lands thus appropriated " are acquired for the purpose of providing a means of free passage common to all the people, and, consequently, may be rightfully used in any way that will subserve that purpose. By the taking the public

acquire a right of free passage over every part of the land, not only by the means in use when the lands were taken, but by such other means as the improvements of the age and new wants arising out of an increase in population or an enlargement of business may render necessary. It is perfectly consistent with the purposes for which streets are acquired that the public authorities should adapt them in their use to the improvements and conveniences of the age." (*Halsey* v. *Rapid Transit St. R. Co.*, 47 N. J. Eq. 380, 384.)

Recognizing the fact that the "right of free passage" is a comprehensive term which, in this advanced age, may embrace the transmission of thought and words as a substitute for the actual physical passage of persons over a public highway, and thereby greatly facilitate social and commercial intercourse, the Legislature of this State, in providing for the incorporation of telegraph and telephone companies, has expressly granted to them the right to construct their lines upon any of the public roads, streets or highways of the State, provided the same shall not be so constructed as to interfere with the public use of such roads or highways. (Laws of 1848, chap. 265, as amd. by Laws of 1853, chap. 471; Transportation Corporations Law, Laws of 1890, chap. 566, art. 8, § 102.)

A legislative enactment is, of course, of no value whatever as an authority for an encroachment upon a constitutional right, and in the present instance it is not cited for that purpose, but simply as evidence of a legislative belief that the construction of telegraph and telephone wires in a public highway is not inconsistent with the use for which such highway was originally designed ; and this idea is by no means limited to impotent expressions of opinion, for it is one which has received express judicial sanction in some of our sister States, while in our own State it has been adopted by implication, so far at least as urban streets are concerned.

In *Cater* v. *Northwestern Telephone Ex. Co.* (60 Minn. 539, 547), which was a case involving the precise question we are now discussing, it was said concerning the rights of an abutting owner whose fee extended to the center of the street: " We are not unmindful that private property cannot be taken for a public use without compensation, however important that public use is.   *   *   * But viewing, as we do, highways as being designed as public avenues of travel, traffic and communication, the use of which is not neces-

sarily limited to travel and the transportation of property in moving vehicles, but extends as well to communication by the transmission of intelligence, it seems to us that such a use of a highway is within the general purpose for which highways are designed, and within the limitations which we have suggested, does not impose an additional servitude upon the land. In short, that it is *merely a newly-discovered method of using the old public easement.*"

In *Julia Building Assn.* v. *Bell Telephone Co.* (88 Mo. 258) the defendant was engaged in erecting poles in a public street, to the center of which the fee was in the plaintiff, and the court, in holding that the poles did not impose an additional burden upon the easement in the street, said : " As civilization advances new uses may be found expedient."

In *Pierce* v. *Drew* (136 Mass. 75) the Supreme Court of Massachusetts, in discussing the constitutionality of a legislative grant to a telegraph company of the right to erect its poles and wires in a public highway, without compensation to adjoining owners, uses this language : " When the land was taken for a highway, that which was taken was not merely the privilege of traveling over it in the then known vehicles, or of using it in the then known methods, for either the conveyance of property or transmission of intelligence. * * * The discovery of the telegraph developed a new and valuable mode of communicating intelligence. Its use is certainly similar to, if not identical with, that public use of transmitting information for which the highway was originally taken, even if the means adopted are quite different from the post-boy or the mail-coach. It is a newly-discovered method of exercising the old public easement, and all appropriate methods must have been deemed to have been paid for when the road was laid out." And the same doctrine has been declared in Indiana (*Magee* v. *Overshiner*, 49 N. E. Rep. 951), in Michigan (*People* v. *Eaton*, 100 Mich. 208), and in Montana (*Hershfield* v. *Rocky Mt. Bell Tel. Co.*, 12 Mont. 102).

It is but fair to say, however, that in several of the States the decisions are not in harmony with those to which attention has been directed, while in others, including our own, the courts have apparently limited the application of the rule for which the defendant is

contending to streets in cities.  For example, in *Lockhart v. Craig St. Ry. Co.* (139 Penn. St. 419) the distinction between an easement in a country and a city street is thus clearly stated : " It has generally been understood in Pennsylvania that the abutting owner has a fee to the middle of the adjoining street, and that the public has only a right of passage over it;  *   *   *   but this must not be taken in its literal sense, especially in towns and cities.   What might be considered an invasion of private right, so far as the use of a highway is concerned in the country, might not be so in a city.   *   *   *

" And it may be now taken as settled that the owner's rights as to abutting property are subject to the paramount right of the public, and the rights of the public are not limited to a mere right of way, but extend to all beneficial legitimate street uses, such as the public may from time to time require."

And again, in *Eels v. A. T. & T. Co.* (143 N. Y. 133), which was a case where the defendant had erected telegraph poles in a country highway, it was held that the State can neither appropriate to its own special, continuous and exclusive use, nor can it authorize a corporation to so appropriate any portion of a *rural* public highway, by setting up poles therein for the purpose of supporting telegraph and telephone wires.   But the court, in reaching this conclusion, recognized the fact that the easement in a public street in a city or village might well be enlarged by the necessities of the case, and it was careful to say that it neither decided nor intimated that " the defendant would or would not have the right to place its poles in the city street without compensation to the owner if he owned to the center of the street."

Nor is the distinction to which we have adverted altogether a product of recent investigation, for as long ago as 1863 it was said, by a jurist of conceded ability that he did not believe it " necessary or possible for the courts to lay down the exact limits of the uses to which land dedicated to a street in a great city may be applied, or for which it may be required."  (EMOTT, J., in *People v. Kerr*, 27 N. Y. 188, 203.)

. Subsequently, and in 1875, the language above quoted was cited with approval by the Court of Appeals, and it was supplemented by the further declaration that " it may be urged with some apparent

reason that the appropriation of land for a street in a city carries with it the idea that it is to be used for all necessary purposes, as such street, which the interest of the public and the comfort, enjoyment or the health of the locality may demand." (*Bloomfield, etc., Gas Light Co.* v. *Calkins,* 62 N. Y. 386.)

In 1883 the General Term of the second department, in speaking of urban streets, asserted that "the requirements of the public in such a place are more numerous than in a rural locality, and streets and avenues are to supply such demands; a mere right of passage over the surface is quite insufficient." (*Crook* v. *Flatbush Water Works Co.,* 29 Hun, 245, 247.)

And in a still more recent case the Court of Appeals, in referring to the distinction between the two classes of highways, gave utterance to this significant language: "The public easements, however, in the streets of cities and villages are more extensive. In urban streets, the public convenience and health and the general welfare require that the soil thereof should be subjected to greater burdens. They may be used for the laying of water and gas pipes and the construction of sewers, and some other purposes. *The public generally have an interest in and are benefited by such improvements, and they are necessities of modern life.*" (*Van Brunt* v. *Town of Flatbush,* 128 N. Y. 50.)

The last adjudicated case in which this question has received consideration at the hands of the court of last resort is that of *Palmer* v. *Larchmont Electric Co.* (158 N. Y. 231). Considerable stress is there laid upon the distinction which is said to exist between the use of a street for a municipal or mere street purpose, and it was held that inasmuch as light is necessary to the traveling public, a country highway might be burdened with poles and wires for the purpose of operating an electric light system, whereas it could not be thus burdened for the transmission of intelligence by electricity, because the former is, and the latter is not, a purely street purpose.

Whether the use of a street by a telephone system is to be classified as a "municipal purpose" is not stated by the learned jurist by whom the opinion of the court was delivered, and so far as this particular case is concerned, it is, perhaps, of little consequence to which class it ought to be assigned, for we are now dealing with the purpose to which a street in a populous city may properly be

devoted, and upon the authority of the cases to which we have referred, including the one last cited, we shall assume that it is now the settled law of this State that in circumstances such as surround the present case the rights of an abutting owner, even though his fee extends to the center of the street, are subject to the paramount right of the public to use such street for any purpose which the enjoyment, comfort and convenience of the locality may require; and thus we come finally to what we deem the controlling question in this case, viz. : Is this newly-discovered method of transmitting intelligence a public convenience ; and, if so, is it one to the use of which a street in a populous city may be devoted consistently with the general purpose for which that street was originally designed ?

So far as the first branch of this inquiry is concerned we assume that it may be unhesitatingly answered in the affirmative ; for of all the discoveries of modern science the telephone is one of the most wonderful, as it is one of the most useful, and its convenience is more especially appreciated by the residents of large cities whose homes are generally at a great distance from their places of business. This simple contrivance annihilates space, and by its aid relatives and friends widely separated may communicate with each other ; business of vast importance may be transacted ; a physician may be summoned in case of illness and assistance obtained whenever a fire or other calamity overtakes a person. In short, there are a thousand ways in which it can be used to such advantage as to render it well-nigh indispensable to an urban resident. And this being the case, why is its maintenance a purpose for which a city street may not properly be used ? As has been said by an eminent text writer, " with respect to streets in populous places, the public convenience requires more than the mere right to pass over and upon." (2 Dillon Mun. Corp. § 688.)

And in the light of recent discoveries it might be added that public convenience requires that they be used for the very purpose for which the defendants are attempting to use the one in question.

We have seen that the transmission of intelligence by electricity is not only a public convenience, but a public necessity, and where, as in the present instance, the means employed for such communication neither disfigures the surface of the street nor interferes in any degree with its use by travelers upon foot or in vehicles, no

good reason suggests itself to our mind why it should be regarded as an additional burden, entitling the owner of the fee to further compensation.

The rule which commends itself to our approval in cases of this character is the one which was laid down by the Supreme Court of the United States when it declared that " On the general question as to the rights of the public in a city street, we cannot see any material difference in principle with regard to the extent of those rights, whether the fee is in the public or in the adjacent land-owner, or in some third person.   In either case the street is legally open and free for the public passage, *and for such other public uses as are necessary in a city, and do not prevent its use as a thorough-fare.*"   (*Barney* v. *Keokuk*, 94 U. S. 324, 340.)

We conclude, therefore, that the order appealed from should be affirmed.

All concurred, except LAUGHLIN, J., who dissented in a memorandum.

LAUGHLIN, J. (dissenting):

Telephone companies are private corporations, organized and con-ducted for the individual profit of the stockholders.   The telephone is so extensively used that it seems indispensable to professional men and those engaged in various lines of trade and business, and it is a great convenience to all others who have occasion and financial ability to use it.   Strictly speaking, however, the telephone is not a public necessity or convenience.   It accommodates and serves the public to no greater extent than street, steam, surface and elevated railroads; and as to these, regardless of whether they obstruct light, air and access, it is well settled that their construction is an additional burden upon the owner of the fee.   (*Williams* v. *New York Central R. R. Co.*, 16 N. Y. 97; *Craig* v. *Rochester City & B. R. R. Co.*, 39 id. 404; *Henderson* v. *N. Y. C. R. R. Co.*, 78 id. 423; *Story* v. *N. Y. El. R. R. Co.*, 90 id. 188; *Fobes* v. *R., W. & O. R. R. Co.*, 121 id. 505; *Reining* v. *N. Y., L. & W. R. Co.*, 128 id. 163.)

Telephones are not essential to the health of the community, or to the safety of the lives or property of the inhabitants of a city. This line is not being constructed for the city, or in fulfillment of

any duty to the public enjoined upon the municipality by the Legislature. ' Placing conduits for telephone wires in this avenue is not a proper municipal or street use as against the owner of the fee. Telephone poles and wires, or conduits for such wires, may not· be lawfully erected, strung or placed in a public street or highway by a private corporation for the purpose of private contract service, without obtaining the consent of the owner of the ·fee of the street or highway, or acquiring the right so to do by condemnation proceedings.   (Cases relating to railroads, *supra ; Bloomfield, etc., Gas Light Co.* v. *Calkins,* 62 N. Y. 386 ; *Eels* v. *A. T. & T. Co.,* 143 N. Y. 133 ; *Van Siclen* v. *Jamaica El. L. Co.,* 45 App. Div. 2 ; *Johnson* v. *Thomson-Houston El. Co.,* 54 Hun, 469 ; *Metropolitan, etc., Co.* v. *Colwell,* 50 N. Y. Super. Ct. 488 ; *Edsall* v. *Howell,* 86 Hun, 431 ; *Palmer* v. *Larchmont Electric Co.,* 158 N. Y. 231, 235.)

Substantial damages not being alleged, it may be that a court of equity is not required to grant injunctive relief. ( *Wormser* v. *Brown,* 149 N. Y. 172, 173, 174, and cases cited.)   The majority of the court would not, however, if that were the only question, affirm on that ground ; and in affirming they enunciate a new rule of law which I deem untenable.   I, therefore, dissent, without critically examining the question as to whether or not the order could be sustained upon the .other ground.

Order affirmed, with ten dollars costs and disbursements.