In that case the appellate division reversed a judgment in favor of the plaintiffs in an action to recover $1,000 deposited by the tenants as security for the faithful performance of the agreement on their part. The court laid special stress on the fact that when the lease was made the land was vacant, and that defendants agreed and did at great expense erect a brick building to answer the requirements of the lease. Judge Hatch says:

"It seems clear that at that time the provision of the $1,000 as liquidated damages was a reasonable provision for the damage which might have been sustained by an immediate breach and before entry."

In the lease before me the defendants covenant to erect a one-story extension, and make one store of the two single stores now in the premises, but it does not appear that this was to be done before entry, or that the lease was dependent upon the alterations. The lease is dated October 21, 1890, and is to commence November 1, 1890, but the landlords are to erect the extension "as soon as they can obtain permission from the proper authorities," and no evidence was offered at the trial to prove that these alterations were ever made by the landlords. Moreover, the $500 deposited is to be received, at the option of the landlords, in case of a breach of his covenants by the tenant. It is not agreed, therefore, that the $500 is to be liquidated damages in any event, but only in case the landlords so desire; in other words, the damages are not liquidated. I am of the opinion that this case falls within the rules under which this court must disregard the descriptive words used, and, looking at the lease as a whole, conclude that the $500 deposited should be regarded as a penalty. All the characteristics by which the appellate division distinguish Chaude v. Shepard, supra, are found in this case. It is an ordinary lease of a building in existence at the time when the lease was made. The breach of covenant was for nonpayment of rent, and the damages arising out of such breach were capable of accurate ascertainment, and the sum reserved was largely in excess of such damage.

Motion denied.

(38 Misc. Rep. 549.)
BARNEY v. BOARD OF RAPID TRANSIT R. COM'RS FOR CITY OF
NEW YORK et al.

(Supreme Court, Special Term, New York County. August, 1902.)

1. INJUNCTION—SUIT BY TAXPAYER—COMPARATIVE DAMAGES.

   The rapid transit commissioners of the city of New York in constructing a tunnel unjustifiably deviated from the routes and general plan of construction adopted by them as required by statute, and built the eastern branch tunnel within 7 feet of the house line, instead of 37 feet, as shown on the original plan. Plaintiff, a taxpayer, sued such board, and moved for an injunction pendente lite. It appeared that, because of the condition of the work, it would cost no more for the city to complete the tunnel than it would to fill it up on the abandonment of the work, and that such abandonment would necessitate building another tunnel, which would cause an enormous loss to the taxpayers. *Held*, that the injunction would be denied.

Action by Charles T. Barney against the board of rapid transit railroad commissioners for the city of New York and others. Motion for injunction. Denied.

Masten & Nichols (Arthur H. Masten, of counsel), for the motion.

Parsons, Shepard & Ogden (Edward M. Shepard, of counsel) and Boardman, Platt & Soley (Albert B. Boardman, of counsel), for Board of Rapid Transit R. Com'rs.

George L. Rives, Corp. Counsel (George L. Rives and Terence Farley, of counsel) and Nicoll, Anable & Lindsay (De Lancey Nicoll and Raymond D. Thurber, of counsel), for defendant John B. McDonald, opposed.

GIEGERICH, J. The gravamen of the action is the alleged unlawful act of the defendants in so directing the construction of the rapid transit tunnel under Park avenue, between Thirty-Fourth and Forty-Second streets, that the easterly wall of the tunnel is made to follow a line distant only 7 feet from the building or house line of the street, it being claimed that in the plan of construction adopted there is a substantial departure from the maps and descriptions prepared by the board of rapid transit commissioners, in accordance with the statute which created their powers; the legality of their acts in causing the building of the tunnel being dependent upon their following the scheme of construction outlined or described in these maps and descriptions, styled, for the purposes of the case "Routes and General Plan." It appears that the tunnel at this point was delineated by the drawings, which formed a part of the routes and general plan, as under the center of the street, with its easterly wall distant some 37 feet from the building or house line. If these drawings with their attendant description were to control the method of construction, then the present method is unlawful, because of the very substantial divergence in plan which has resulted. The statute has provided the means for legalizing any change of plan which involves a substantial divergence from the original scheme of construction (Rapid Transit Act, Laws 1895, c. 519, § 38); and if the present structure is unlawful, the illegality exists simply because the proper steps have not been taken, not because the defendants' acts are in any way condemned by public policy. It may be that before this action is brought to trial any illegality which exists will be removed, and, for other reasons to be stated, the right of the plaintiff to a preliminary injunction does not depend upon the mere fact that there has been a substantial departure from the authorized plan in the building of this tunnel. Upon the question of the present legality of the structure, it is contended by the defendants that the construction, as practically undertaken, is in accordance with the "routes and general plan"; the argument being that the proposed line of the tunnel under Park avenue at this point was necessarily subject to such modification as might be found essential for making "suitable tracks and connections from the portion of the route near the corner of Park avenue and Forty-Second street to the yard and tracks of the Grand Central Station," as set forth in the "route and general plan." It has been proven by the affidavits of experts that, as a matter of

engineering science, the curve and depression of the tracks for the making of suitable connections with the tracks of the Grand Central Station call for a construction of the tunnel from Thirty-Second street or Thirty-Fourth street to Forty-Second street, as at present in process, and the claim is that the delineation of a different line of the route, as found in the drawings, must give way to whatever was involved in the making of these "suitable connections." I do not think that such extreme flexibility of interpretation of the "routes and general plan" can be resorted to. The purpose of the statute in calling for a proposed plan is expressed quite clearly, to wit: "Such general plan shall show the general mode of operation, and contain such details as to manner of construction as may be necessary to show the extent to which any street, avenue, or other public place is to be encroached upon, and the property abutting thereon affected." These necessary details the "routes and general plan" undertook to show for the advisement of all persons interested, and in order that intelligent action might be taken by them to conserve their best interests in the subsequent proceedings for the confirmation and approval of the plan. Taking the words used in the "routes and general plan" with the plans or drawings to which they referred, no person could be expected to apprehend that the fixed position of the tunnel, as under the central portion of the street, was subject to such a change as would bring it for about 10 blocks to a point 30 feet nearer the building or house line than was indicated, merely because "suitable connections" were to be made near Forty-Second street. A civil engineer might have found that something was omitted, or that there was a variance between the plan, which showed no means of making connections, and the specifications which mentioned the proposed connections; but a layman, for whose advisement the "routes and general plan" had been prepared under the statute, could properly assume that, in some way best known to engineering science, these "suitable connections" were to be made from a tunnel under the middle of the street. Certainly, he could rely upon the general proposition that the scientific construction of a railway, with the necessary curves for the approach toward a given point, does not depend upon guesswork or chance, and I think, therefore, that no reasonable interpretation of the "routes and general plan" could afford room for justifying the extraordinary change in the position of the tunnel as constructed from the line described in the lawfully approved plan of construction as to this particuar locality. The fact being found that the work of building the tunnel at the point in question is prosecuted without legal authority, there is, technically, support for the plaintiff's action, which is directed against the expenditure of public funds for an unlawful purpose; but upon the facts disclosed it is perfectly clear that the remedy sought by way of an injunction is no remedy, and that to grant so-called "relief" in this form would be preposterous. The work of construction has advanced so far that the cost of completing it will about equal the necessary expense which must be incurred in properly refilling it, if abandoned. To enjoin the further construction must involve the requirement, by mandatory injunction, that the part excavated be restored for the safety of the public, and this condition of safety, according to the proof, and

without actual dispute, may as readily be secured by completing the work as it stands. Abandonment of the tunnel in question—the easterly one—carries with it the city's obligation to incur the vast expense of the construction of another tunnel farther west, and the actual result of the injunction, founded upon the technical cause of action in behalf of a taxpayer, would be to put the city, and so its taxpayers, to an enormous aggregate loss. In the case of Rogers v. O'Brien, 153 N. Y. 357, 47 N. E. 456, the court of appeals construed the taxpayer's act adversely to the contention that a threatened illegal act of the municipality was alone sufficient to support an injunction at the suit of a taxpayer, where an inequity would result if the relief was granted; and I find in this authority ample support for the proposition that in such a case as is presented by the papers before me, where the right to relief is founded upon a literal construction of the statute, and is contrary to the justice of the case, as well as to the interest of all persons whom the decision could affect, the injunction should be withheld. Motion denied, with $10 costs to each of the defendants separately appearing.

Motion denied, with $10 costs to each of defendants appearing separately.