(54 Misc. Rep. 423)

POTTER et al. v. INTERBOROUGH RAPID TRANSIT CO. et al.

(Supreme Court, Special Term, New York County.    May, 1907.)

1. MUNICIPAL CORPORATIONS—STREETS—PUBLIC RIGHTS.

The public right to a street in the city of New York includes its use for every kind of travel and communication, for the movement of persons or property, which is reasonable or proper, and which may be necessitated, in the judgment of the public authorities, by the inadequacy of the surface for the accommodation of public travel.

2. SAME—RIGHTS OF ABUTTING OWNER—VAULTS IN STREET.

The right of a property owner on a public street in the city of New York to maintain vault spaces under a sidewalk exists only by virtue of a permit from the city, revocable whenever the city or public use requires such space.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 1444.]

3. SAME—RIGHTS OF UNDERGROUND RAILWAY.

Plaintiffs were owners of premises on Broadway and licensees from the city of vault spaces under the sidewalk, extending along the premises and out as far as the curb line. The underground railway took a portion of such vault spaces and threatened a removal of a brick wall constructed by the plaintiffs within the line of the street, which constituted a part of the wall of a station. Held, that the removal of such wall would not be restrained, where neither the transit company nor the board of transit commissioners claim a right to send passengers through the plaintiffs' building without their consent, but only claimed that the location of the wall is not authorized.

Action by Frederick Potter and Clarence Kelsey against the Interborough Rapid Transit Company and the board of rapid transit commissioners of the city of New York.    Judgment for defendants.

John Larkin, for plaintiffs.

Strong & Cadwalader, for defendant Interborough Rapid Transit Company.

George L. Reves, for defendant board of rapid transit railroad commissioners.

FITZGERALD, J.    This is an action by the owners of the premises situated at the southwest corner of Broadway and Rector street, in this city, to restrain the threatened destruction and removal by the defendants of a brick wall constructed by the plaintiffs, constituting part of the westerly wall of the station of the underground railway, known as the "Subway," at that place, and standing between the platform of said station and steps or stairway leading therefrom to the plaintiffs' building.    The present building of the plaintiffs, whose testator acquired title to the premises in 1884, was erected in 1897, in place of an old building which then stood thereon, and which had appurtenant to it vaults under the sidewalk of Broadway extending along almost the entire front of the premises, 78 feet, and out as far as the curb line.    Those vaults were constructed prior to 1857 under an authority the nature, extent, terms, and conditions of which are unknown, since the city's records do not antedate that year.    Larger vaults being required in connection with the new and larger building, application was made to the city for permission to use such larger vault space, which was refused, unless payment was

made for the entire area thereof. That payment having been made un-
der protest, suit was subsequently successfully brought to recover back
that portion thereof which represented the payment held to have been
made for the old vaults. The proposed construction of a rapid transit
tunnel railway in lower Broadway being a matter of public knowledge
and discussion, one of the plaintiffs (Frederick Potter), after an in-
formal discussion with an engineer of the defendant board, arranged
the plans of the new building to provide for an entrance thereto from
a station of said railway, constructed the basement of the building on a
level with that of the platform of the expected station, and built the
basement wall with an arch to allow for said entrance.

At that time the Constitution of this state forbade the enactment of
any law authorizing the construction or operation of a street railroad
without the consent of the owners of one-half in value of the property
bounded thereon, or, if unobtainable, in lieu thereof, the determination,
when judicially confirmed, of three commissioners appointed by the Ap-
pellate Division of this court, after hearing of interested parties, and
also the consent of the local authorities having control of the portion
of the city's street or highway affected. That provision of the funda-
mental law applied to subway railways. Matter of District R. R. Co.,
107 N. Y. 42, 14 N. E. 187. The rapid transit act then provided that,
after the said board should determine the existence of a public need for
the establishment of a rapid transit railway, it should then determine
and establish the route or routes thereof, and the general plan of con-
struction, the latter of which should "show the general mode of opera-
tion and contain such detail as to manner of construction as may be nec-
essary to show the extent to which any street, avenue or other public
place is encroached upon and the property abutting thereon affected."
After the adoption of the plans and conclusions of said board by the
common council, and the approval thereof by the mayor, the route so
determined might be located, provided the consents of the said property-
owners along the line thereof were obtained, or, in lieu thereof, the
order of the Appellate Division of this court confirming the determina-
tion of commissioners appointed by it, made after due hearing of in-
terested parties. The act further provided (section 6) that, after such
consents, determination, or order were given or made, the board should
at once prepare "detailed plans and specifications for the construction
of such rapid transit railway or railways in accordance with the gen-
eral plan of construction, including all devices and appurtenances deem-
ed by it necessary to secure the greatest efficiency, public convenience
and safety, including the number, location and description of stations,
and plans and specifications for the suitable supports, turnouts, switches,
sidings, connections, landing places, buildings, platforms, stairways,
elevator, telegraph and signal devices, and other suitable appliances in-
cidental and requisite to what the said board may approve as the best
and most efficient system of rapid transit in view of the public needs and
requirements." The board might alter such plans and specifications,
in accordance, however, with the general plan of construction, and (sec-
tion 38) "no changes or modifications in the plans and specifications con-
sented to and authorized pursuant to section 5 of this act shall be made
without the further consent and authorization provided for in said sec-

tion." Provisions were made in sections 37 and 39 for the means of payment for the rights, privileges, and easements of abutting owners, for the right of the contractor to condemn the same, and for the prevention of improper interference therewith.

Early in 1901 the said board adopted a route and general plans for a rapid transit railway running down and under Broadway, directly in front of the plaintiffs' building, and under the East river to Brooklyn. As the material parts thereof are hereinafter discussed, it is unnecessary to quote such plans here. At the same time the board formally resolved:

"That this board hereby adopts the drawings now produced, and numbered 1, 2, 3, 4, 5, and 6, as showing the route and general plan hereby adopted."

The route as adopted expressly included a loop or branch, the center line of which should begin at a point which should be found most convenient in Broadway between Bowling Green and Exchange Place. In one of said drawings, Exhibit 12, showing the general line of the route down Broadway, but exhibiting no stations or details, the said loop was shown as diverging from the main line opposite the plaintiffs' premises, which would have prevented the construction of a station at that place. Another of said drawings, Exhibit 20, showed a typical station, consisting of a platform with the central part of the station running back away from the tracks into an intersecting street, 60 feet wide, and crossing the longitudinal street of the route at right angles. The said route and general plans were approved by the common council and the mayor; but because of a failure to obtain sufficient consents from property owners the appointment of the said commissioners was applied for and secured, and their determination that the railroad as laid out ought to be constructed and operated was obtained and confirmed. Accordingly a form of contract and detailed drawings were adopted by the board, one of which, 2 C–1, showed the details of construction of a proposed station at the intersection of the west side of Broadway with Rector street, with a flight of stairs leading directly into the basement floor of the plaintiffs' premises. A contract for the construction of said railroad was subsequently made with the Rapid Transit Subway Construction Company. The plaintiff above referred to, the managing trustee of the building, neither consented to the construction of the road nor opposed it before the Appellate Division. He did not at the times referred to examine either said Exhibit 12 or Exhibit 20; but he was furnished with the detailed plan of the station, 2 C–1. When actual work was about to be begun in front of his premises, he wrote the representative of the said board for plans showing the encroachment upon the vaults, because, as he stated, considerable rearrangement of the machinery and tanks in the subcellar would have to be made before the contractors "started in" on his vaults. After receipt of those plans, he was notified, not in absolutely accurate form, that the plan of the railroad required the permanent use of that portion of his vaults under the roadway of Broadway and under the sidewalk outside of the line of the street, that the contractor would occupy the same, and that plaintiff should immediately remove his property therefrom. Thereafter further correspondence ensued, and, at plaintiffs' request, a conference was

had concerning the removal of the machinery which the work of the contractor would interfere with, with the result that such machinery was removed. The construction was completed, and the station was shortly after put in use.

Contrary to the expectation of the parties at their informal discussion above referred to, the level of the station platform as constructed was lower than the basement floor of the plaintiffs' building, necessitating a short flight of steps to the latter. A wall through the arched opening provided by the plaintiff when constructing the building was removed with the plaintiffs' knowledge, and a wooden partition was erected at the top of the steps to keep the workmen on the station from the building. The contractor assigned the lease part of the contract to the defendant company, between which and the plaintiff, and, finally, the said board, correspondence and negotiations ensued concerning the removal of the wooden partition, the care and maintenance of the station entrance through the plaintiffs' building and the cost thereof, the responsibility for accidents occurring therein, and the terms and conditions of an agreement concerning the same. These negotiations resulted in nothing, and the plaintiff finally boarded over the steps, used the space (about six feet wide east and west, and as long as the steps are wide) between the building line and the brick wall referred to, and hence lying, not upon the plaintiffs' fee, but within the line of Broadway, and erected the brick wall in question, which the engineer of the defendant board has threatened to tear down, and to erect instead another wall near the top of the steps and along the building line. The space occupied by the steps is not needed at present. No right of way in or over the plaintiffs' building or the basement corridors thereof has been acquired by condemnation or otherwise. Neither of the defendants asserts the right to send passengers through the building of the plaintiffs without their consent. They state the question at issue to be merely the proper location of the wall to keep people from entering the building.

The brick wall is built on part of the vault space formerly occupied by the plaintiffs, within the line of Broadway, and not upon the plaintiffs' fee. It constitutes part of the westerly wall of the station, being built flush with the portions thereof connected by it. If the road had been constructed according to the plan shown by Exhibit 12, there could have been no station at Rector street in front of the plaintiffs' premises, and the plaintiffs' vault spaces would have been untouched. If the station had been constructed according to Exhibit 20, the "typical station" plan, but 441 square feet of the plaintiffs' vaults would have been taken. As actually constructed, it takes over 1,000 square feet thereof, and the taking of more thereof is threatened. The plaintiffs contend that their rights to the said vaults constitute property rights attached to their fee, being dominant easements in the street under the surface thereof similar to the dominant easements of an abutting owner over the surface of the streets, of which they cannot be deprived either by the city of its own motion or by legislative command, without adequate compensation, or, assuming that for public purposes they may be deprived thereof without compensation, only so much of said vault space can be taken as was necessary according to the route and general plans of the

rapid transit board to which it is legally presumed their consent was given in the form of the order of the Appellate Division of this court confirming the report of the commissioners appointed by it.   It seems to me, however, that there can be no question that the fee of the street known as Broadway in front of the plaintiffs' premises is, in the city of New York, in trust, nevertheless, for the public, for the purposes of general travel and of using the same for laying water, gas, and sewer pipes, and for other and additional public and beneficial purposes to which, without illegal injury to individuals, the said street may be or become, with the development of the municipality, applicable. People v. Kerr, 27 N. Y. 188, 203.

The public right to that street included its use for "every kind of travel and communication, for the movement or transportation of persons or property, which is reasonable or proper in the use of a public street," and which may be necessitated, in the judgment of the public authorities, by the inadequacy of the surface for the accommodation of public travel.   Sears v. Crocker, 184 Mass. 586, 69 N. E. 327, 100 Am. St. Rep. 577.   Among such uses is that for a subsurface or tunnel railroad.   With respect to the rapid transit railway in this city, our highest court has declared that it was a public necessity, enforced by the crowded and congested condition of the surface of our streets and the requirements of public transportation, which the city was forced to build with its own money, at its own risk, and which it was authorized to build under the Constitution of the state.   Sun Printing & Publishing Ass'n v. Mayor, etc., 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788.   It is true that abutting property owners, like the plaintiffs, have the right to insist upon the street being kept open as such, and have easements of access from the street, and of light and air coming therefrom, of which they cannot be arbitrarily deprived, without compensation, by structures useless for or foreign to general street purposes, even though authorized or ordered by the Legislature.   This rule was established and applied in the well-known "elevated railroad cases" and "Park avenue viaduct cases," in this city, upon which so much stress is placed by counsel for the plaintiffs (Story v. N. Y. El. R. R. Co., 90 N. Y. 122, 43 Am. Rep. 146; Lahr v. Met. El. Ry. Co., 104 N. Y. 268, 10 N. E. 528; Abendroth v. Man. Ry. Co., 122 N. Y. 1, 25 N. E. 496, 11 L. R. A. 634, 19 Am. St. Rep. 461; Lewis v. N. Y. & H. R. R. Co., 162 N. Y. 202, 56 N. E. 540; Kane v. El. R. R. Co., 125 N. Y. 164, 26 N. E. 278, 11 L. R. A. 640; Reining v. N. Y. El. R. R. Co., 128 N. Y. 157, 28 N. E. 640, 14 L. R. A. 133; Muhlker v. Harlem R. R. Co., 197 U. S. 544, 25 Sup. Ct. 522, 49 L. Ed. 872), because, as a matter of fact, the structures involved therein, an elevated platform and viaduct holding the rails of steam railroads, were subversive of and repugnant to the uses of the streets on which they were erected as open public streets.   It is true that in the first cited case it was said that "the public purpose of the street requires of the soil the surface only," and that very ancient usage permits the introduction under it of sewers, water pipes, and upon it posts for lamps.   That statement must be regarded in the light of public knowledge and experience at the time it was made, before an underground railway in the principal street of the city of New York was deemed necessary or physically possible.   As was said substantially in

People v. Kerr, supra, the justice who should attempt to define the limits to or for which the land of a city street might be applied or required by his own knowledge or experience at the time would go far beyond what his predecessor might have dreamed of a century ago, but "would be left far in the background in the progress of civilization and improvement which is to take place in the hundred years to come." The statement took no account of the urban development which in the course of time made an underground rapid transit railway in the city of New York in the judgment of the same court (Sun Printing & Publishing Ass'n v. Mayor, etc., 152 N. Y. 257, 46 N. E. 499, 37 L. R. A. 788) a great and pressing public necessity.

Consideration must next be given to the nature of the plaintiffs' rights to the vault spaces in front of their property and to the effect thereon of the public use of the street in which they were situated. I think that at no time, even prior to 1856 and 1897, did they have more than a revocable permit or license from the city to maintain said vaults. While it is true that the city's records do not antedate 1856, by which time the old vaults were in use, and we cannot, therefore, learn the exact nature or extent of the authority under which they were constructed and maintained, yet that conclusion is consistent with the well-known rule that the city can grant no permanent or exclusive right in the streets. But, however that may be, the new vaults, erected in 1897, on part of the area of which the brick wall in question now stands, were constructed and maintained, accepted and paid for, under a license or permit from the city, revocable whenever the city or public uses required them; for, indeed, that was the express language of the permit (Exhibit A). The recovery at law by the plaintiffs from the city of the amount that must have been paid for the old vault space was no adjudication of any property right of the plaintiffs in those old vaults, but simply that they should not be compelled to pay twice therefor. In Deshong v. City of New York, 176 N. Y. 475, 68 N. E. 880, it was said that:

"Whenever the existence of a vault would interfere with the public use of the street, the right to maintain it must be held to terminate, as the rights of individuals under such permits must be regarded as subordinate to the necessities or requirements of the public."

So, in the case of March v. City of New York, Mr. Justice Bischoff, in his opinion at Special Term (which is printed in 69 App. Div. 3, 74 N. Y. Supp. 630, 1151, where his conclusion was affirmed by the Appellate Division), said substantially that no trespass was disclosed in the destruction, by work done in pursuance of such authority as the city could give under its contract, of a vault maintained, presumptively, by virtue of a license from the city, though it is true that the justice concluded that the work was done in purported compliance with the statute, and without departure from the authority conferred thereby, matters which are hereafter considered. In Sears v. Crocker, supra, the court, after holding that the use of the subsurface of the streets for purposes of public travel was not an unreasonable use in reference either to travelers or abutters, said that the mere fact that it deprived abutters of the use of vaults and other similar underground structures in the street which they had theretofore maintained is of little consequence. The cases of Parish v. Baird, 160 N. Y. 302, 306, 54 N. E. 724, and

Matter of Bklyn. Union El. R. R. Co., 105 App. Div. 112, 93 N. Y. Supp. 924, where actions for damages to vaults were sustained, were controversies between the holders of the vault rights and third party wrongdoers. The taking of the vaults by the city for a public use was not in question.

This brings us to the second contention of the plaintiffs. This, too, I think, must fail. The constitutional provision above referred to merely prohibited a legislative authorization of the construction or operation of a street railroad, except upon the condition precedent thereto, that the consent of the local authorities and of the owners of one-half in value of the abutting property, given by themselves, or, if refused by them, by commissioners, be first obtained. It does not require a detailed plan of the exact location of the road and all its appurtenances as a condition precedent to securing the necessary consents. Reference, therefore, must be had to the language of the statute, the rapid transit act, to determine the sufficiency of the proceedings to obtain the said consents. As the appropriate provisions thereof have been above specifically referred to, they need not now be repeated. It is true that it prescribes that the "general plan of construction" determined and established, with the route or routes of the proposed railway, by the board, prior to application for the said consents, shall show the general mode of operation and contain such details as to manner of construction as may be necessary to show the extent of encroachment on the public street and of the effect on abutting property. But there is no requirement that the details of construction, which can only be learned after great labor and expense, shall be determined and stated as a condition precedent to obtaining the consents, or that the consents are necessarily predicated thereon. On the contrary, section 6 of the act provides that the detailed plans and specifications for construction, "including the number, location and description of stations and plans and specifications for * * * landing places, platforms and stairways," were all to be prepared after the requisite constitutional and statutory consents had been obtained. It is true that the same section prescribed that the detailed plans and specifications should be "in accordance with the general plan of construction" previously determined and established, and, as a matter of fact, one of the numbered drawings produced and adopted by the board as showing the route and general plan adopted (Exhibit 12) showed a branch or loop opposite plaintiffs' premises which would have prevented the construction of a station in front thereof. But the route and general plans adopted by the board, after enumerating the streets through which the railroad is to run, the number of tracks and tunnels, and the height and width of the latter, expressly leaves many matters open for further consideration. Thus at stations the width might be increased, the tracks should be along the center of the longitudinal streets of the route, "so far as may be practicable and convenient," the walls should not come within five feet of the exterior lines of said streets except at "stations (and) station approaches," which, "so far as practicable," should be at the intersection of street, and built under streets or properly acquired private property, and siding accommodations not exceeding a quarter of a mile for each mile of roadway might be constructed. Furthermore, the express language of the reso-

lutions establishing that route stated that the divergence of the loop or branch from the main line might begin at the most convenient point in Broadway between Bowling Green and Exchange Place, and hence south of the plaintiffs' property. The drawing, therefore, showing a diversion opposite the plaintiffs' property north of Exchange Place, was erroneous. The plaintiff did not appear before the Supreme Court commissioners for further particulars, or for correction or explanation of the error. The board obviously reserved the right of shifting the point of divergence as far south as Bowling Green, if convenient. It did so, without affecting in any way the plaintiffs' abutting property, except to benefit it; for by the shifting the loop farther south the operations of the railway were brought further away from their property. These considerations distinguish this situation from the so-called Barney Cases. Barney v. Rapid Transit Com., 38 Misc. Rep. 549, 77 N. Y. Supp. 1083; Huntington v. City of New York (C. C.) 118 Fed. 683; Barney v. Same, 39 Misc. Rep. 719, 80 N. Y. Supp. 972; Id., 83 App. Div. 237, 82 N. Y. Supp. 124; Barney v. N. Y., 193 U. S. 430, 24 Sup. Ct. 502, 48 L. Ed. 737. In those no station was involved. The drawings annexed to the route and general plans were expressly incorporated into and made part of the latter, and there, though the greatest permissible departure of the road from the center of the street was expressly measured and stated, the road, as constructed, wholly departed from the exact location established by such measurements.

But it is further contended that the station actually constructed did not exactly conform to the typical station plan shown on the drawing (Exhibit No. 20). But the number, location, and description of stations were to be fixed in the detailed plans, prepared after the consents were obtained, and were not fixed by the route and general plans; and, as the typical station was exclusively applicable to a street 60 feet wide intersecting the longitudinal street of the route at right angles, it was physically impossible to construct it at Rector street, less than 40 feet wide and intersecting Broadway at an acute angle. Moreover, though estoppel is not pleaded, it is a significant circumstance, worthy of notice by a court of equity, that the station as erected was constructed with the full knowledge, acquiescence, and almost co-operation of the plaintiffs, who provided for an entrance from it to their building until negotiations for its care and the cost of maintenance were broken off. The board of rapid transit commissioners, which has the exclusive control of the railroad property (Interborough R. T. Co. v. City of New York, 47 Misc. Rep. 221, 95 N. Y. Supp. 886), evidently regard the space occupied by the brick wall as a present or future necessity, and the wall itself an incumbrance.

For the reason above stated, I direct judgment in favor of the defendants, dismissing the complaint, with separate bills of costs. Settle decision and judgment on notice.