M. ANNIE STANLEY, as Executrix, etc., of WILLIAM FOSTER, Deceased, Respondent, *v.* THE JAY STREET CONNECTING RAILROAD, Appellant.

Second Department, February 21, 1918.

Railroads — right to use streets — granting of franchises — " public use " — " public convenience and a necessity " — order of Public Service Commission granting certificate of " public convenience and a necessity " not subject to collateral attack — " public use " of street by freight terminal railroad — application of chapter 10 of the Laws of 1860 — Railroad Law, section 173, requiring sale of franchises at public auction not applicable to franchise granted under Greater New York charter — right of abutting owner not owning fee of street — injunction — when use of street by freight terminal railroad does not constitute a taking of easements.

The right to use the streets as highways is in the public at large and is controlled by the Legislature subject to the limitation under sections 18 and 20 of article 3 of the Constitution.

Since the amendment of the Constitution adopted November 3, 1874, railroad franchises to occupy public streets may be granted only pursuant to general laws, and the construction or operation of a street railroad

Second Department, February, 1918.    [Vol. 182.

cannot be authorized except with the consent of the local authorities and the owners of one-half in value of the abutting property, or, if such property owners' consents be not given, the determination of the court that such railroad ought to be constructed and operated.

Although the terms " public use " and " public convenience and a necessity " are not identical in meaning, a " public use " may not be a " public convenience and a necessity," but it cannot be said that the operation of a railroad is a " public convenience and a necessity " unless it is a " public use."

The question whether a use is a public one is judicial.

A determination of the Public Service Commission in granting a certificate of " public convenience and a necessity " that a use is public is final, at least as against collateral attack.

When a railroad company occupies a city street in a locality devoted almost exclusively to factories by a siding or spur track constituting an integral part of the transportation system of the country over which freight is transported to other carriers, the freight becomes part of the interstate and intrastate commerce of the country, and the use is public, although said track is now connected with only one private factory.

Chapter 10 of the Laws of 1860, preventing the organization of railroad companies under any law except those passed subsequently thereto, applies only to the territory of the city of New York as it was at that time, and, hence, does not prevent the organization of a railroad under the General Railroad Law of 1890 in the city of Brooklyn now constituting a part of Greater New York.

The provisions of section 173 of the Railroad Law, that franchises shall be sold at public auction, are not applicable to a franchise granted under section 74 of the Greater New York charter.

The laying of the rails of a freight terminal railroad on the surface of the street, without change of grade, and the reasonable use thereof do not constitute a taking of easements in the street so as to entitle an abutting owner, who does not own the fee of the street in front of his premises, to an injunction restraining the operation of the railroad until compensation is made.

APPEAL by the defendant, The Jay Street Connecting Railroad, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 10th day of August, 1917, upon the decision of the court after a trial at the Kings County Special Term.

The judgment enjoined defendant from maintaining a railroad in Plymouth street, Brooklyn, in front of the premises of plaintiff's testator, and directed the removal of its tracks therefrom.

The defendant maintains a terminal or connecting railroad with tracks running through certain streets in a section of

the borough of Brooklyn bordering on the East river. The tracks are connected, by spurs or turnouts, with a number of factories owned and operated by private firms or corporations. By means of these connections the defendant delivers freight, which it receives from the trunk line railroads, directly into the factories. It also, as agent for the trunk line railroad companies, collects freight from the different factories in freight cars, moves such cars to the water front, where they are run onto barges, carried to the trunk line roads and shipped to various points of destination. One of defendant's tracks runs through Plymouth street in front of and close to property of plaintiff's testator, and, after crossing Bridge street, into Kirkman & Son's soap factory. This action is brought to compel the removal of the track in front of the premises of plaintiff's testator, and has resulted in a judgment to that effect, from which defendant has appealed to this court. (See 100 Misc. Rep. 493.)

*William N. Dykman* [*Arthur E. Goddard* with him on the brief], for the appellant.

*William Wills,* for the respondent.

BLACKMAR, J.:

Two questions arise on this appeal which are entirely distinct and should not be confused: *First,* is the railroad unlawfully on the street as to the public, and, *second,* does it impair plaintiff's easements in the streets appurtenant to his abutting property?

The right to use the streets as highways is in the public at large. The Legislature, representing the people, controls the right and can modify or abolish it at pleasure. I know of no limitation to that power except under sections 18 and 20 of article 3 of the Constitution. Providing it is not done by private or local bill, and has the assent of two-thirds of the members elected to each branch, and the requirements of section 18 of article 3 of the Constitution as to street railroads are complied with, the power of the Legislature to dispose of the streets and highways, so far as the rights of the public are concerned, has no constitutional limitation.

Prior to the amendment of the Constitution (Art. 3, § 18) adopted by the people November 3, 1874, railroad franchises to occupy the public streets were sometimes granted to railroad companies by private bill. Since that time such franchises may be granted only pursuant to general laws, nor can the construction or operation of a street railroad be authorized except with the consent of the local authorities and of the owners of one-half in value of the abutting property, or, if such property owners' consents be not given, the determination of the court that such railroad ought to be constructed and operated. The board of estimate and apportionment, representing the city, and the Public Service Commission, representing the State, are the agencies through which the Legislature grants the franchise. But it is claimed that they have been given power by the Legislature to grant the right to lay tracks in the streets for public use only; that the occupancy of Plymouth street by defendant is a private, not a public, use, and that, therefore, although the defendant complied with the provisions of law and obtained the requisite consents of the board of estimate and apportionment, the property owners and the Public Service Commission, it obtained no franchise to use the street.

There is strong reason for holding that the certificate of public convenience and a necessity given by the Public Service Commission is conclusive evidence that the use is a public one. This seems to be the decision in *People ex rel. Steward* v. *Railroad Comrs.* (160 N. Y. 202). Chief Judge PARKER, in sustaining the power to review the determination of the railroad commissioners on the question of " public convenience and a necessity " for the construction of a railroad, held that the determination was final and could not be attacked collaterally. It is true that the terms " public use " and " public convenience and a necessity " are not identical in meaning. A public use may not be a " public convenience and a necessity," as in the case of parallel railroads; but I conceive it can hardly be said that the operation of a railroad is a public convenience and a necessity unless it is a public use. (*People ex rel. N. Y. C., etc., Co.* v. *Public Service Commission,* 195 N. Y. 157.) The question whether a use is a public one is a judicial question. (*Matter of Niagara*

*Falls & Whirlpool R. Co.,* 108 N. Y. 375.) The State has established a tribunal to decide the question. Its decision is reviewable by the courts on the writ of certiorari; and I incline to the view that the Public Service Commission having so determined in granting the certificate of public convenience and a necessity, the question is finally settled, at least as against a collateral attack.

But I believe that the use was a public one. It is different in principle from the use considered in *Fanning* v. *Osborne* (102 N. Y. 441); *Hatfield* v. *Straus* (189 id. 208) and *Brooklyn Heights R. R. Co.* v. *Steers* (213 id. 76); upon which cases this respondent relies. The defendant's railroad is an integral part of the transportation system of the country. The freight which it receives over the spurs and sidings from private factories is taken to the water front, loaded on barges, transferred to railroads, and becomes part of the interstate and intrastate commerce of the country. It is a connecting road which acts as agent and issues bills of lading for every trunk line that reaches the port. The section of the city where its tracks are laid is devoted largely, if not exclusively, to factories. The defendant leads its tracks to the doors of many of these factories, and by its contract with the board of estimate and apportionment it is bound to extend its service to others where practicable. The moment that a carload of freight is taken from the factory upon the streets it is in transit and its movement to its destination has begun. The defendant company is, I think, engaged in public service as much as any trunk line railroad. It runs its tracks and sidings into private property; but that is part of the obligation of public service and may be compelled. (Pub. Serv. Comm. Law [Consol. Laws, chap. 48; Laws of 1910, chap. 480], § 27.)* The fact that it can give like service only to those whose factories are on its route does not make the service any the less public. Neither a water company nor a gas nor an electric light company can do more, but no one has even suggested that they are not public service corporations. *Fanning* v. *Osborne* (*supra*) concerned a purely private convenience not connected

---

* See, also, Laws of 1917, chap. 801, since adding to said § 27, subd. 3. — [REP.

with commerce. *Hatfield* v. *Straus* (*supra*) was the same, and *Brooklyn Heights R. R. Co.* v. *Steers* (*supra*) was decided in view of the general character and purposes of the plaintiff's charter. It is suggested that if the franchise in question is valid, so would one be running through Clinton or Washington avenue. The answer to this is that the board of estimate and apportionment are the guardians of the city. Except for the constitutional provisions of 1874, already referred to, the Legislature could have authorized any kind of a railroad, serving a public use, in Washington or Clinton avenue or any other street; but now those streets which are not protected by special acts of Legislature are guarded by the local authorities and by the abutting property owners themselves, or, in case of their refusal to consent, by this court.

In *Brooklyn Heights R. R. Co.* v. *Steers* (*supra*), Judge CARDOZO, writing for the court, said: " We are not required at this time to say that a franchise which distinctly authorized the construction of sidings such as the one complained of, would be illegal. It is enough at this time for us to hold, as we do, that no such franchise has been granted." In the case at bar exactly such a franchise has been granted, for the contract with the board of estimate and apportionment authorizes the defendant to construct the sidings complained of. The *Steers Case* (*supra*) is, therefore, not an authority against their legality. I think that the case of *Clarke* v. *Blackmar* (47 N. Y. 150) is direct authority that a franchise like the one attacked in this case is for a public use. That was a railroad siding built through the streets of Buffalo from a grain elevator operated by the defendants' Blackmar and Baxter, to the Grand Trunk and New York Central road under authority of the common council of Buffalo. The words of the charter of Buffalo were broad enough to authorize the grant of such a franchise, but it was objected that the use was not a public one, for it served only Blackmar and Baxter, and that the common council of Buffalo had no authority to grant the right to use the streets for private purposes. This is exactly the same objection made in the case at bar. But the court in that case said: " The track is not private, but must be regarded as a branch track of the New York Central and Grand Trunk; and the fact that the elevator, in the transaction

of its extensive business, is greatly benefited  *  *  *  does not show it to be private." I am not able to distinguish that case from the one at bar. It seems, therefore, both upon reason and authority, that the siding or spur of the defendant road in Plymouth street serves a public use although now connected only with Kirkman's soap factory.

The defendant railroad was organized under the General Railroad Law of 1890 (Gen. Laws, chap. 39 [Laws of 1890, chap. 565], as amd.), which revised the General Railroad Law of 1850 (Laws of 1850, chap. 140, as amd.), and it is claimed that chapter 10 of the Laws of 1860 prevents organization under any law except those passed subsequently thereto. This law, if applicable, would prevent organization under the act of 1850. But the act of 1860 applied only to the territory of the city of New York as it was then. Its enactment was motived by conditions then existing within the limits of the city of New York. It did not concern the political government, then known as the Mayor, Aldermen and Commonalty of the City of New York; but it was for the protection of certain streets then embraced in the city. The consolidation of municipalities into Greater New York did not affect the territorial application of that act. (*Matter of O'Brien* v. *Boyle*, 219 N. Y. 195.)

Neither is the provision of the Railroad Law (Consol. Laws, chap. 49 [Laws of 1910, chap. 481], § 173) requiring that franchises should be sold at public auction applicable to this case. The provisions of the Railroad Law concerning street surface railroads (Laws of 1884, chap. 252, and amendments) show on their face that the requirement applies only to the roads commonly known as street railroads whose primary function is to carry passengers from one part of the city to another, and not to the defendant, whose road is part of the trunk line freight carriers. Besides, that section 173 of the Railroad Law contains the following provision: " Nothing herein contained shall apply to, or affect any grant hereafter made under the provisions of title one, chapter three of chapter three hundred and seventy-eight of the laws of eighteen hundred and ninety-seven and the amendments thereto known as the Greater New York Charter." The defendant's franchise was granted under such provision of the charter (Laws of 1901,

chap. 466, § 74, as amd. by Laws of 1905, chaps. 629, 630; Id. § 74, as added by Laws of 1914, chap. 467). The charter does not direct that the franchise shall be sold at public auction, but that the grant shall be in the form of a contract containing all terms and conditions. I see no reason why the franchise is not legal so far as the public rights to the street are concerned.

On broad principles of public policy, this is the conclusion which should be reached. The commerce of the port of New York is limited by its terminal facilities. New York city is the greatest manufacturing locality in America; its industries live only as they are nourished by the streams of commerce bringing in the raw material and carrying out the finished product. From the small section of the city lying near the water front on the Brooklyn side of the East river, beneath the viaducts of the Brooklyn and Manhattan bridges, there move over the defendant connecting railroad over 700,000 tons of freight a year. To inject this into the arteries of commerce by facilities for actual handling is a serious problem, and the continued commercial supremacy of the city depends in part on the way in which it is solved. A decision which would prevent the use of the streets of those parts of the city given over to factories, for economical movement of freight by means of tracks and sidings, would be a serious blow to New York city's commerce. Marginal roads, connecting roads, all facilities for gathering freight at the factories, would be impossible, and the city of New York must continue to carry its commerce handicapped by the use of archaic and costly means of bringing its freight to the rail carriers. To adjudge the validity of the franchise in question does not mean the surrender of streets to railroad companies to the danger and inconvenience of the people. The board of estimate and apportionment, the Public Service Commission and the owners of the abutting property may be safely trusted to protect the interests of the citizens.

There remains to consider whether the defendant's track and the operation of the road in Plymouth street constitute a taking of plaintiff's property. If so, it should be enjoined until compensation is made. The case of *Williams* v. *New York Central Railroad Co.* (16 N. Y. 97) holds that when the

owner of property abutting on a street owns also the fee of the land in the bed of the street subject to the public use for street purposes, a railroad in the street is an additional burden on the fee which constitutes a taking of property and entitles the owner to compensation.   This is still the law.   (*Craig* v. *Rochester City & Brighton R. R. Co.*, 39 N. Y. 404; *Peck* v. *Schenectady R. Co.*, 170 id. 298.)   As the plaintiff did not own the fee of Plymouth street in front of his premises, the doctrine does not apply.

But if the abutting owner does not own the fee of the bed of the street, a surface railroad in the street does not take his property, and any damage which may be caused his property is *damnum absque injuria*.   (*Drake* v. *Hudson River R. R. Co.*, 7 Barb. 508; *People* v. *Kerr*, 27 N. Y. 188; *Kellinger* v. *Forty-second St., etc., R. R. Co.*, 50 id. 206; *Fobes* v. *R., W. & O. R. R. Co.*, 121 id. 505.)   The rule applies whether the street is an urban street or a rural road, and whether the motive power is the horse, electricity or steam.   This doctrine is so limited that if it be found that the occupation of the street is exclusive, permanent and of such a nature as to deprive the owner of such uses of the street as are appurtenant to his abutting property, usually called the easements of light, air and access, the road, although legal so far as the rights of the people are concerned, is illegal as to him until compensation is made.   The elevated railroad cases rest on this principle (*Story* v. *New York Elevated R. R. Co.*, 90 N. Y. 122; *Lahr* v. *Metropolitan Elevated R. Co.*, 104 id. 268; *Kane* v. *N. Y. E. R. R. Co.*, 125 id. 164), and the same is the case with other permanent and exclusive occupations of the street for railroad purposes which take easements in streets appurtenant to abutting property.   (*Reining* v. *N. Y., L. & W. R. Co.*, 128 N. Y. 157; *Egerer* v. *N. Y. C. & H. R. R. R. Co.*, 130 id. 108.)   If the use of a street by a railroad lawfully there is so excessive and unreasonable as to deprive an owner of abutting property of his easement therein, he is entitled to his remedy.   (*Mahady* v. *Bushwick Railroad Co.*, 91 N. Y. 148.) But no case of which I am aware goes so far as to hold that rails laid on the surface of the street without change of grade, and the reasonable use thereof, constitute a taking of easements in the street.   This is all that the defendant has done.

The finding of fact numbered V in the decision of the court is reversed; that numbered VII is reversed in so far as it finds that there is any damage to plaintiff's intestate except consequential damage; that numbered VIII is reversed in so far as it finds that property rights, easements and privileges of plaintiff's intestate have been taken by defendant; that numbered IX is reversed. The conclusions of law are reversed. The findings of fact made on plaintiff's requests numbered 5, 7, 8 and 9 are reversed. The defendant's requests to find numbered 4, 5, 6, 7, 8, 10, 11, 12, 13, 15, 22, 23 and 24 are found, and the conclusions of law proposed by defendant numbered 2, 3, 4 and 5 are found. The judgment is reversed and judgment directed for defendant dismissing plaintiff's complaint on the merits, with costs.

Present — Jenks, P. J., Thomas, Rich, Putnam and Blackmar, JJ.

Judgment reversed, and judgment unanimously directed for defendant dismissing the complaint on the merits, with costs. Order to be settled before Mr. Justice Blackmar.